Paul POMBRIANT

v.

**BLUE CROSS/BLUE SHIELD
OF MAINE.**

Supreme Judicial Court of Maine.

Argued March 10, 1989.
Decided July 14, 1989.

William D. Robitzek, Paul F. Macri (orally), Berman, Simmons & Goldberg, Lewiston, for plaintiff.

John A. Mitchell (orally), Verrill & Dana, Portland, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and HORNBY, JJ.

GLASSMAN, Justice.

The defendant, Blue Cross/Blue Shield of Maine (Blue Cross), appeals from a judgment for the plaintiff, Paul Pombriant, entered on a jury verdict in the Superior Court (Androscoggin County, *Cole, J.*) awarding Pombriant compensatory and punitive damages for Blue Cross's tortious interference with a contract between Pombriant and Bennett Industries (Bennett) and the breach of a contract between Pombriant and Blue Cross. Blue Cross challenges the sufficiency of the evidence to support the awards and contends a double recovery of compensatory damages was awarded to Pombriant. We affirm the judgment.

## I

■ The jury would have been warranted in finding, *inter alia,* the following facts: Both Pombriant and the Bill Johnson Insurance Agency, Inc. (Johnson) are licensed insurance brokers. Bennett is a shoe manufacturing and importing business. Although its manufacturing arm is located in Maine, its executive headquarters is located in Lynn, Massachusetts. Prior to 1983, Johnson had been the broker of record for Bennett and placed Bennett's insurance with Aetna Life and Casualty (Aetna).[1] By a letter dated March 28, 1983 signed by its executive vice president of finance, Donald Miller, Bennett changed its broker of record to Pombriant. This letter was on file with Blue Cross. Pombriant continued Bennett's insurance coverage with Aetna.

In 1983 Blue Cross initiated a new program, managed by Lynn Edwards (Edwards), providing for the first time that Blue Cross would pay a commission to brokers. In furtherance of this program, Blue Cross signed agreements with a limited number of brokers providing that its insurance in Maine would be sold only through these brokers. Pombriant and Johnson both had such an agreement with Blue Cross. In 1983, Edwards issued to all the brokers for Blue Cross a "Quote Protocol" setting out the procedure to be followed when requests for quotes on the same business were received from one or more of its brokers.[2]

---

1. A broker becomes a representative of a company when it obtains from the company a broker of record letter. This allows the broker exclusive access to census data, such as age, sex and marital status, concerning employees to be covered by the insurance; and access to the company's insurance experience data, including the amount of premiums paid and number and amount of insurance claims made by the company. It further allows the broker the exclusive right to present this information together with the company's insurance requirements to an insurance company in order to secure a price at which the insurance company can provide the requested coverage.

2. The "Quote Protocol" provided, *inter alia,* that if the brokers each had a broker of record letter from the proposed insured, if the insurance had been placed in the previous year by one broker, he would be assumed to be the broker of record. In case a proposal had been delivered and a dispute arose, "the proposal with original presentor will stand unless the new entrant can prove previous year placement of the group's

Beginning in August 1983 a district manager of Blue Cross contacted Pombriant several times about the possibility of Blue Cross making a proposal for Bennett's insurance for 1984. By a letter dated January 6, 1984, Johnson forwarded to Blue Cross a letter signed by Clifton Whitney as vice-president of manufacturing for Bennett, stating that Johnson had been appointed as of January 5, 1984 the broker of record for Bennett. The district manager showed this letter to Pombriant. Pombriant insisted that the district manager accompany him to the Portland office of Blue Cross to examine the March 1983 letter appointing Pombriant Bennett's broker of record and reminded the district manager of the many telephone calls he had made to Pombriant seeking the insurance coverage of Bennett. From the district manager's assurance, "Paul, you're our man," Pombriant understood that when furnished with the necessary data, Blue Cross would furnish Pombriant quotations for Bennett's insurance coverage. To avoid any further misunderstanding, a letter dated January 13, 1984 signed by Miller was forwarded to Blue Cross affirming that Pombriant was Bennett's broker of record for its insurance programs and would remain so and further stating that "this letter supersedes any and all previous letters."

Shortly thereafter, Pombriant received the necessary census and experience data from Aetna and met with Blue Cross representatives on February 8 at which time the data was furnished Blue Cross and the nature of the proposal for insurance coverage of Bennett by Blue Cross was discussed. Pombriant later learned that Aetna by mistake had also furnished this information to Johnson. After Blue Cross advised Pombriant they would not give a proposal on the Bennett business, Pombriant learned that a proposal on this business had been furnished by Blue Cross to Johnson. Pombriant immediately contacted the district manager and was assured that a proposal would also be furnished to Pombriant. When Pombriant went to the office of Blue Cross to pick up the proposal, he

was advised by the district manager that he could not be given one. Pombriant reminded the district manager that he was the broker of record for all of Bennett's insurance programs and asked why the protocol established by Blue Cross was not being followed, he was referred to Edwards. Edwards advised Pombriant there was confusion as to who was the broker of record for Bennett. Almost immediately a telephone message from Bennett was left in the office of Edwards advising her that Johnson was not the broker of record for Bennett. That same day a letter was sent by Federal Express to Edwards confirming that Pombriant not Johnson was the broker of record for Bennett for all its insurance programs and that all information, requests, proposals and any other matters pertaining to insurance for Bennett was to go through Pombriant's office.

Pombriant never received a proposal from Blue Cross on Bennett's insurance. By a letter dated March 5, 1984, Edwards advised Pombriant that Blue Cross was that week issuing its only proposal on the Bennett insurance coverage to another broker. On March 14, Pombriant's attorney sent a Mailgram to Blue Cross indicating that if the Bennett insurance business was placed through Johnson it would represent a breach of Pombriant's contract. The Bennett insurance coverage by Blue Cross for 1984 was placed through Johnson, who received $12,371.63 over a four-year period as a brokerage fee for such placement. Blue Cross removed Pombriant from its list of approved brokers. In 1983 Pombriant had received $15,000 as a brokerage fee for the placement of Bennett's coverage with Aetna for that year. He had also incurred some expenses in traveling to and from Lynn, Massachusetts to service the account. The jury also heard testimony that the Bennett account was the only account Pombriant had lost in the ten years he had been in business, and since his removal from the list of Blue Cross approved brokers, he was unable to place any insurance with Blue Cross.

health insurance business and can obtain a currently dated appointment as broker of record."

By his complaint against Blue Cross, Pombriant sought compensatory and punitive damages from Blue Cross for its alleged willful and tortious interference with Pombriant's contract with Bennett and for Blue Cross's breach of contract with Pombriant. After a trial, by a special verdict form the jury found that Blue Cross had intentionally and improperly interfered with Pombriant's business relationship with Bennett and awarded Pombriant $12,371.63 as compensatory damages; that Blue Cross had breached its contract with Pombriant and awarded Pombriant $100,000 for that breach of contract and awarded an additional $250,000 to Pombriant as punitive damages. Judgment was entered for Pombriant in the amount of $362,371.63, plus interest and costs. After a hearing, the trial court denied Blue Cross's motion for a judgment notwithstanding the verdict or a new trial, and Blue Cross appeals.

## II

■ Blue Cross first contends that because the evidence is insufficient to support the jury's finding that Blue Cross tortiously interfered with Pombriant's contractual relationship with Bennett, the trial court erred in denying Blue Cross's motion for a judgment notwithstanding the verdict. We disagree.

In reviewing the denial of Blue Cross's motion for a judgment notwithstanding the verdict we determine whether by any reasonable view of the evidence, including the inferences to be drawn therefrom, taken in the light most favorable to Pombriant, the verdict can be sustained. *Buchanan v. Martin Marietta Corp.*, 494 A.2d 677, 678 (Me.1985). The judgment in favor of Pombriant must stand unless it is clearly erroneous. *Cyr v. Michaud*, 454 A.2d 1376, 1380 (Me.1983). We have long recognized that if a person by fraud or intimidation procures the breach of a contract that would have continued but for such wrongful interference, that person can be liable in damages for such tortious interference. *MacKerron v. Madura*, 445 A.2d 680, 683 (Me.1982).

Contrary to the assertions of Blue Cross, intimidation is not restricted to "frightening a person for coercive purposes." *See Taylor v. Pratt*, 135 Me. 282, 195 A. 205 (1937) (intimidation for physician-defendant to tell plaintiff's employer he would withdraw all prescriptions and see that none of his patients had prescriptions filled at employer's pharmacy so long as plaintiff employed at pharmacy); *MacKerron v. Madura*, 445 A.2d at 683 (allegation that defendant police officer advised plaintiff attorney's client defendant would seek to have criminal charges against client dismissed if attorney withdrew from case included essential element of intimidation). Our examination of the record discloses that the evidence presented to the jury would reasonably support a finding that Blue Cross procured the breach of contract between Pombriant and Bennett by the intimidating means of making it clear to Bennett that the only manner in which it could avail itself of Blue Cross's lower rates for the desired insurance would be by using the brokerage services of Johnson; and, but for such wrongful interference by Blue Cross, the contract between Bennett and Pombriant would have continued. Accordingly, we find no error in the trial court's denial of Blue Cross's motion for a judgment notwithstanding the verdict of the jury in that regard.

## III

■ Blue Cross also contends that the evidence was not sufficient to support the award of punitive damages and the "unusual legal status" of Blue Cross precludes such an award. We disagree.

"[P]unitive damages are available based upon tortious conduct only if the defendant acted with malice." *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me.1985). The requirement of express or actual malice exists when the defendant's tortious conduct is motivated by ill will toward the plaintiff. *Id.; Ramirez v. Rogers*, 540 A.2d 475, 478 (Me.1988). Proof of this conduct must be by clear and convincing evidence. *Tuttle v. Raymond*, 494 A.2d at 1362–63. The evidence in this case establishes that Blue

Cross intended to mislead Pombriant and ensure that he did not get the information furnished to Johnson in order to prevent Pombriant from placing Bennett's insurance coverage with Blue Cross, and in fact the conduct of Blue Cross did prevent Pombriant from so doing, resulting in a financial loss to Pombriant. Our review of the record discloses that the factfinder could reasonably have been persuaded that it was highly probable that Blue Cross acted with malice toward Pombriant and therefore an award of punitive damages was permissible. *See Taylor v. Commissioner of Mental Health and Mental Retardation,* 481 A.2d 139, 153 (Me.1984). We find no merit in the further contention of Blue Cross that as a nonprofit corporation it has an "unusual legal status" akin to a municipal corporation that precludes the award of punitive damages, as such damages cannot be awarded against municipal corporations or government agencies.

## IV

Blue Cross finally contends that the damages awarded Pombriant for its breach of its contract with Pombriant should be set aside as duplicative of the damages awarded to Pombriant for Blue Cross's tortious interference with the contract between Pombriant and Bennett or because the amount of the damages rested upon speculation and conjecture. We disagree.

We have previously stated that the purpose of compensatory damages in a contract case is to place the plaintiff in the same position he would have been absent the breach of contract. *Forbes v. Wells Beach Casino, Inc.,* 409 A.2d 646, 654 (Me. 1979). The general rule of law requiring a party claiming damages for a wrong suffered to establish the amount to a reasonable certainty does not require absolute certainty. We stated in *Merrill Trust Co. v. State of Maine,* 417 A.2d 435, 440–41 (Me.1980):

> Damages are not fatally uncertain for the reason that the amount of the loss sustained is incapable of exact proof by mathematical demonstration. The triers

of facts are allowed to act upon probable and inferential as well as direct and positive proof. They are permitted to make the most intelligible and probable estimate which the nature of the case will permit, given all the facts and circumstances having relevancy to show the probable amount of damages suffered. A monetary award based on a judgmental approximation is proper, provided the evidence establishes facts from which the amount of damages may be determined to a probability.

*See also King v. King,* 507 A.2d 1057, 1059 (Me.1986) (recoverable damages need not be proved to mathematical certainty but grounded in facts already in evidence).

The parties agreed that a special verdict form be used by the jury providing for a separate finding as to the damages for the tortious interference of the contract between Pombriant and Bennett and for the breach by Blue Cross of its brokerage contract with Pombriant. Each of the awards enumerated in this form was grounded on a separate and distinct contract. Although there were two separate contracts, on the evidence in this case Blue Cross's tortious interference with Pombriant's contract with Bennett could only be effected by Blue Cross simultaneously breaching its own contract with Pombriant. By Blue Cross's refusal to provide Pombriant with a price quotation for Bennett's insurance coverage, Blue Cross not only tortiously interfered with Pombriant's contract with Bennett but breached its own brokerage contract with Pombriant. The special verdict form provided for the allocation of the compensatory damage award to Pombriant between the two contracts. Blue Cross did not, and does not now, object to the trial court's instructions to the jury on compensatory damages. The jury allocated $12,-371.63 as compensatory damages for the interference with Pombriant's contract with Bennett and $100,000 for Blue Cross's breach of its contract with Pombriant.

In support of the award of compensatory damages in the amount of $112,371.63, the jury could have found that Johnson had realized $12,371.63 in commissions from Blue Cross for the placement of part of

Bennett's insurance coverage with Blue Cross; that in 1983 Pombriant had earned $15,000 in commissions for the placement of Bennett's insurance coverage; that he had incurred some expenses in traveling from Maine to Lynn, Massachusetts, during 1983 to service that account; that in the ten years he had been in business as an independent broker he had lost only this one client; that he was on good terms with and had expected to continue as broker of record for Bennett; and that because of Blue Cross's breach of its brokerage contract with Pombriant, Pombriant could no longer place any insurance coverage with Blue Cross. On this evidence the jury's award to Pombriant of total compensatory damages in the amount of $112,371.63 for his loss over a reasonable period of time of profits from commissions that he would have received in placing Bennett's insurance cannot be said to rest on speculation or conjecture nor be a double recovery of compensatory damages for Blue Cross's tortious interference with Pombriant's contract with Bennett and Blue Cross's breach of its contract with Pombriant. Accordingly, the trial court properly denied Blue Cross's motion for a judgment notwithstanding the verdict or a new trial.

The entry is:

Judgment affirmed.

McKUSICK, C.J., and ROBERTS and WATHEN, JJ., concur.

CLIFFORD, Justice, concurring in part and dissenting in part.

I agree with the court that the evidence of Blue Cross's tortious interference with Pombriant's contractual relationship with Bennett Industries is sufficient to allow the jury's award of compensatory and punitive damages for that injury to remain undisturbed. I would, however, vacate the jury's $100,000 damage award for Blue Cross's breach of its contract with Pombriant. I agree with Justice Hornby that there was no evidence of any damages suffered by Pombriant from that breach of contract other than the loss of business with Bennett, which the jury found to be $12,371.63. Because the additional $100,000 contract damage award constitutes an impermissible double recovery, *see Theriault v. Swan*, 558 A.2d 369, 372 (Me.1989), I would vacate the judgment and grant Blue Cross a new trial unless Pombriant remits all damages in excess of $262,371.63.

HORNBY, Justice, dissenting.

When all is said and done, Blue Cross refused to issue a quotation for the Bennett account through Pombriant and provided a quotation through Johnson instead. The jury found that this was an intentional interference by Blue Cross with the contractual relationship between Pombriant and Bennett.

This Court has wisely maintained the requirement of intimidation or fraud[1] as a necessary element in an action for tortious interference with a contractual relationship, *see MacKerron v. Madura*, 445 A.2d 680 (Me.1982); *Taylor v. Pratt*, 135 Me. 282, 195 A. 205 (1937); *Perkins v. Pendleton*, 90 Me. 166, 38 A. 96 (1897), rather than adopt the open-ended definition of other courts and the Restatement (Second) of Torts § 767.[2] The only "intimidation" in the record lies, in the Court's words, in

---

1. Pombriant has not argued that undue influence supports the tort on this record. *See MacNaughton v. Cossin*, 493 A.2d 1040, 1043 (Me. 1985).

2. [T]he courts have more or less continuously expanded the tort, with the effect, perhaps, that the uncertainties in its definition have become more rather than less significant. Although the tort continues to find supporters, it has been subjected to serious criticisms on a wide range of grounds from economics to justice to free speech, with a good deal of emphasis on the idea that an actor should not be held liable for interference with contract unless the interference is accomplished by unlawful means or an independent tort.

All of this leaves open a good many questions about the basis of liability and defense, the types of contract or relationship to be protected, and the kind of interference that will be actionable, each of which requires no little attention before the beginning of an answer can be made. W. Prosser & W. Keeton, *The Law of Torts* § 129 at 979 (5th ed. 1984) (footnotes omitted).

"the intimidating means of making it clear to Bennett that the only manner in which it could avail itself of Blue Cross's lower rates for the desired insurance would be by using the brokerage services of Johnson." That is not intimidation in any ordinary sense of the word; it is simply the imposition of an exclusive dealing arrangement or a refusal to deal through a particular agent. It is not like a police officer threatening to pursue a drunk driving charge unless an individual fires his lawyer, *MacKerron v. Madura,* 445 A.2d 680 (Me. 1982), or a small town doctor threatening to have all his patients boycott a pharmacy unless the pharmacy fires an employee, *Taylor v. Pratt,* 135 Me. 282, 195 A. 205 (1937).

Nor did Blue Cross accomplish its interference with the Bennett–Pombriant relationship through fraud. Although the record does contain assertions that the jury may ultimately have found to be untrue, those assertions did not accomplish the interference. The interference was accomplished by Blue Cross's refusal to deal through Pombriant. That may have been a breach of the contract between Blue Cross and Pombriant, but it was not fraud.

I would therefore vacate the judgment and direct the entry of judgment for Blue Cross so far as the tort claim is concerned, because of the failure to prove that intimidation or fraud accomplished the interference. Without the tort, the punitive damages claim must fail as well. *Forbes v. Wells Beach Casino, Inc.,* 409 A.2d 646, 655 (Me.1979).

The remaining count involves damages for breach of contract. Specifically, the jury found that Blue Cross's quoting through Johnson rather than through Pombriant breached the broker appointment contract between Blue Cross and Pombriant. The jury awarded $100,000 in damages for the breach of that broker appointment contract. The jury earlier and separately awarded $12,371.63—the amount of commissions Blue Cross paid Johnson the

four years it retained the Bennett account—as total compensatory damages flowing from the tort. The *best* Pombriant can offer to support the $100,000 award (apart from the interesting concession that "[t]ort damages for interference with contractual relations are broader"—damages that here are only $12,371.63) is to argue that

> [t]he plaintiff testified that he lost about $15,000 in commissions and service fees in 1984 as a result of losing Bennett Industries. He also testified that he lost only that one client in the ten years he had been in practice on his own, and that he fully expected to continue to be a broker of record for Bennett Industries. Based on this evidence alone, the jury was justified in returning a verdict on the breach of contract count in the amount of $100,000.

But these factors relate to damages not from loss of the Blue Cross contract but from loss of the Bennett contract, which the jury obviously rejected in awarding only $12,371.63 for the tort. This Court enlarges the list, but again the factors relate to loss of the Bennett contract ("total compensatory damages in the amount of $112,371.63 for his loss over a reasonable period of time of profits from commissions that he would have received from placing Bennett's insurance"), not the Blue Cross contract. The record contains no showing of what amounts Pombriant lost as a result of losing his broker relationship with Blue Cross—beyond his loss of the Bennett account. There was reference to three accounts that he had previously placed with Blue Cross, but he testified that all three companies were now out of business, he had not received any commissions on these accounts from Blue Cross in any event, and there was no testimony that he could not successfully place them with other insurers. Thus, aside from the loss that Pombriant suffered in losing the Bennett account, the jury could only speculate[3] in

---

3. The jury was obviously confused. It first sought a repeat of the instruction on punitive and breach of contract damages. It then returned a verdict form that awarded $262,371.63 on the breach of contract—the total of the compensatory and punitive tort damages. After the court indicated that was not acceptable and tried to explain damages further, the forelady

assigning any number to the damages flowing from the breach of the Blue Cross contract. Accordingly I would order a new trial on damages for breach of the Blue Cross contract unless the plaintiff remits all damages over $12,371.63.

reported, "We're very confused, Your Honor." Still another attempt to explain damages was then made. All the damage instructions were in terms of Pombriant's lost profits—"the total amount of lost net income which you determine by computing Plaintiff's gross receipts due under the contract and deducting Plaintiff's expenses of performance under the contract." The record just did not show gross receipts or expenses for Pombriant under the Blue Cross broker appointment contract aside from the Bennett account.