STATE OF MAINE                                    SUPERIOR COURT
AROOSTOOK, ss                                     DOCKET NO. CV-03-055

HERSCHEL CURRIE                    )
          Plaintiff                )
                                   )
                                   )
vs.                                )        **ORDER ON MOTION**
                                   )        **FOR SUMMARY JUDGMENT**
                                   )
                                   )
INDUSTRIAL SECURITY, INC.    and   )        DONALD L. GARRRECHT
IRVING FOREST PRODUCTS, INC.       )        LAW LIBRARY
          Defendants               )

                                            MAY 3 2005

    Pending before the court is the Defendants' Motion for Summary Judgment. [1]

The Plaintiff has brought suit against the Defendants claiming that they terminated his

employment in violation of Maine's Whistle Blower Protection ACT (26 M.R.S.A. §

831, et seq.)(Counts I and II). The Plaintiff also claims that the Defendant Irving Forest

Products, Inc. is liable to him for tortiously interfering with a contractual advantage.

(Count III). For the reasons set forth herein, the court grants the Defendants' motion in its

entirety.

## FACTUAL BACKGROUND

    The material facts of this matter may be summarized as follows. Defendant

Irving Forest Products, Inc. (Irving) owns and operates a lumber mill in Portage, Maine.

Starting in March of 1999, the Plaintiff worked at the mill as a security guard supervisor.

He began this employment as an employee for Hall Security (Hall), a company that had

contracted with Irving to provide security at the mill. In May of 2000, Irving ended its

---

[1] The Plaintiff has maintained that the two Defendants named in this case constitute one "integrated enterprise" or a "single employer" in this case. (See, e.g. Lyes v. City of Riviera Beach Florida, 166 F.3d 1332,1341 (11th Cir. 1999) In prosecuting this motion, the Defendants do not seem to take issue with this contention.

relationship with Hall and contracted with the Defendant Industrial Security, Inc (Industrial) to provide security at the mill.[2] At approximately the same time, Industrial hired the Plaintiff to do the same job for it that he had been previously doing for Hall. The Plaintiff's immediate supervisor was Steve Varga (Varga). Varga's supervisor was Dave Johnson (Johnson). Varga and Johnson were responsible for all Industrial decisions regarding hiring and firing. (Currie Dep. page 37, line 10 to 16).

At all relevant times, the Plaintiff was the security supervisor and had a variety of duties and responsibilities associated with his job. Those duties included monitoring people who came and went or were otherwise present in the mill yard. The Plaintiff had no particular expertise regarding immigration law and he was not responsible for monitoring the immigration status of people coming onto Irving's mill property.

In January of 2000, while he was still an employee for Hall, it came to the Plaintiff's attention that two of Industrial's Canadian employees had come to the mill property in Portage to do compliance audits and equipment checks on logging trucks.[3] During the course of interacting with these two Canadian men at that time, the Plaintiff asked them if they had legal permission to be working in the United States. Based on what he regarded to be equivocal responses, the Plaintiff suspected that the two men did not have the required work visas.[4] He told the men that they would probably get into trouble if they worked without the required visas. The Plaintiff also stated that he did not

---

[2] Industrial has its principal place of business in Canada.

[3] In and of itself, the presence of Canadian workers on site was not particularly remarkable as Canadian timber harvesters were in and out of the mill yard all the time. At this particular time however, it appears that a labor dispute involving a work stoppage was in progress at the mill and that Irving may have had a heightened concern regarding protection of its property during this period of labor unrest.

[4] Although the Plaintiff is not an immigration law expert, it appears that from working in and around the timber harvesting industry, he had acquired a basic understanding, common to many people living in northern Maine, that Canadian workers required a work visa before engaging in any work in the United States.

want to become involved in anything that might be illegal and he declined to work with them. The two men then left the mill.

The next day, and without first speaking to his supervisor, the Plaintiff called U.S.Customs to look into the matter on his own. He gave a customs officer the names of the two Canadians and asked if they were authorized to engage in work in the United States. The customs officer reported that he didn't know and that he would look into it. Several days later, U.S. Border Patrol agent John Merrick called to let him know that although the two men had not been apprehended, to his knowledge they had no right to work in the United States and that he would look into it. Agent Merrick never reported back to the Plaintiff on what if anything he had found out. In fact, no one ever gave the Plaintiff any definitive confirmation regarding whether the two Canadians were authorized to work in the United States or not. The Plaintiff never heard another word about this matter. Industrial subsequently hired the Plaintiff when it took over the contract to provide security services at the mill.

Approximately one year later, in February of 2001, the mill shut down its operations. Industrial was still providing security during this time and an Irving employee, Stan Saucier (Saucier), called the Plaintiff at home on the weekend to report that two Canadians were in the mill yard. Saucier didn't indicate what if anything the two Canadians were doing, just that they were present. The Plaintiff was conscious of what he believed to be a high level of unemployment in Aroostook County and thought that it would be unlikely that immigration authorities would have issued work visas for

3

the kind of relatively unskilled work the Plaintiff assumed that they were doing.[5] He also remembered that a year earlier two Canadians had come to the mill yard and left after he had made inquiries about the legality of their presence in the United States. The Plaintiff called his supervisor; reported to him that two Canadian men were at the mill and asked him if the Canadian men were legal. Varga responded clearly that the men were legal and that they had work permits. Notwithstanding his supervisor's assurance that the men had valid work permits, the Plaintiff harbored doubts and said that he was going to check it out. The Plaintiff concedes that Varga assured him that the Canadians had every right to be where they were.

The Plaintiff then called the U.S. Customs office and again gave the names of the Canadians involved to an officer and asked if they were legally working in the United States.[6] The customs officer was not able to give the Plaintiff an immediate answer. Soon thereafter, Agent Merrick called the Plaintiff back and reported that the two men did not have valid work permits and that they had been apprehended and deported.[7] When the Plaintiff next returned to work, Varga also discussed the matter with the Plaintiff and reported that the two men had been arrested and deported.[8]

Thereafter, the Plaintiff continued to work for Industrial until July 18, 2001. On this date, Johnson called him into the office, told him that he had to do something that he

---

[5] The suggestion is that the two Canadians were engaged in checking woods trucks and this was not skilled work. According to the Plaintiff, "you haven't got to be a genius to check a truck". (Currie dep. p.96 line 20.)

[6] It isn't clear to the court if the two men were the same two men who had been at the mill yard a year earlier.

[7] The parties have made a considerable effort to determine whether the workers in fact were legal (they were able to produce a receipt for payment of the required fee for a work visa) or were not legal (no one appears to have a record of an actual visa that issued). The court does not find determination of that issue to be essential to ruling on the pending motion.

[8] The Plaintiff isn't sure whether these events transpired over a weekend or whether they occurred around his day off. In any event, it appears that the events unfolded over several days.

4

didn't want to do and gave him a letter indicating that his employment was terminated.[9] The letter offered no explanation, nor did Johnson offer any. The reason for the Plaintiff's termination tendered in connection with this litigation was the Plaintiff's disloyalty to his employer premised on the Plaintiff's February 2001 report to U.S. Customs. (SOMF 59) The Plaintiff stated to Johnson that it looked like a decision made by Alain Ouellette (Ouellette), a regional manager for Irving. Johnson didn't reply. The Plaintiff subsequently turned in his equipment and he left the workplace.

In early June of 2001, Irving needed to dispose of approximately 1000 gallons of used paint thinner. Irving employees poured the liquid over a pile of waste material in anticipation of burning it. Another employee, not the Plaintiff, called the Department of Environmental Protection (DEP) to report the plan and DEP responded before any of the chemicals were burned. The Plaintiff did not learn of this until after DEP had intervened. After DEP had responded, the Plaintiff reported the matter to his supervisor and to another Industrial management person. DEP required Irving to clean up the site and it did so at considerable expense. The Plaintiff believes that others at the mill assumed that the Plaintiff had made the report to DEP although he denied having done so. The Plaintiff believes this report to DEP was the largest part of the reason for his termination. (Currie dep. p. 162, line 9)

During the course of his employment with Hall Security, the Plaintiff had written up and filed reports of Ouellette driving through the mill yard on four or five occasions in excess of the 15 mph posted speed. After his employment with Industrial commenced, he had no forms on which to make such reports so he would simply call Ouellette's

---

[9] The Defendants contend the decision to terminate the Plaintiff was actually made in March of 2001 and implementation delayed until July so that a replacement employee could be found. For purposes of this motion, the court accepts the Plaintiff's version of when the decision to terminate the Plaintiff was made.

secretary or his supervisor to report oral reports that Ouellette was speeding through the yard. There were probably four or five of these reports as well. The total number of reports was approximately a dozen. The Plaintiff never spoke directly to Ouellette about his speeding; Ouellette never spoke to the Plaintiff about it. The Plaintiff said that he was unsure if his termination was in anyway related to these speeding reports. (Currie dep. p. 133 line 1 to 3).

## DISCUSSION

### 1. Count I and II: Whistleblower Discrimination

In Count I and II of his complaint, the Plaintiff contends that in terminating his employment, the Defendants violated the Maine's Whistleblower Protection Act (WPA).[10] (26 M.R.S.A. § 831 et. seq) The relevant portions of the WPA provide:

§833. Discrimination against certain employees prohibited

1. DISCRIMINATION PROHIBITED. No employer may discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because:

A. The employee, acting in good faith, or a person acting on behalf of the employee, reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States;

2.INITIAL REPORT TO EMPLOYER RERQUIRED; EXCEPTION. Subsection 1 does not apply to an employee who has reported or caused to be reported a violation, or unsafe condition or practice to a public body, unless the employee has first brought the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation, condition or practice.

---

[10] In Count I, the Plaintiff sets forth a theory of liability premised on the contention that Irving and Industrial constituted an "integrated enterprise" or "single employer". In Count II, the Plaintiff alleges that if Irving and Industrial were not a single employer then Irving acted either as an agent of Industrial or as "a person acting in the interest of any employer, directly or indirectly." (See 5 M.R.S.A. § 4553(4). As indicated herein, the court does not find it necessary to resolve this question because it finds that the Plaintiff has failed to establish essential elements of a prima facie case under either theory.

Prior notice to an employer is not required if the employee has specific reason to believe that reports to the employer will not result in promptly correcting the violation, condition or practice.

The Plaintiff relies on three different theories of liability under the WPA. First, the Plaintiff alleges that the Defendants terminated him after he engaged in a protected action of reporting to federal law enforcement that Industrial had employed illegal Canadian workers. Second, the Plaintiff maintains that the Defendants wrongfully terminated him because they believed that he had reported to DEP that Irving was about to violate environmental laws. Third, the Plaintiff contends that the Defendants wrongfully terminated him because he had repeatedly reported to his employer that Irving's regional manager was driving through the mill yard at an unsafe rate of speed.

The Law Court has stated that in order to prevail on a "whistleblower claim" under the WPA, the Plaintiff must show three things:

1. That he engaged in activity protected by the WPA.

2. That he experienced an adverse employment action;

3. That a causal connection existed between the protected activity and the adverse employment action. Stanley v. Hancock County Commissioners, 2004 ME 157, ¶11, 864 A.2d 169, 173.

Maine employs the shifting burdens analysis described in McDonnell Douglas Corp. v. Green, (citation omitted). Id, ¶12. Pursuant to this approach, once the Plaintiff establishes a prima facie case by presenting evidence, which if believed, would be sufficient to satisfy all three elements set forth above, the Defendant must then satisfy a burden of producing evidence that there was a legitimate, nondiscriminatory reason for the adverse employment action. If the Defendant is able to produce such evidence, the

Plaintiff then has the additional burden of showing that the Defendant's explanation is not genuine and is pretextual. Id.

Summary judgment is appropriate when there are no genuine issues of material fact, and the facts entitle a party to judgment as a matter of law. M.R. Civ. P. 56 (c); In Re Estate of Davis, 2001 ME 106, ¶7, 775 A.2d 1127, 1129. The Court should grant a defendant's motion for summary judgment if the evidence favoring the plaintiff is insufficient to support a verdict for the plaintiff as a matter of law. Curtis v. Porter, 2001 ME 158, ¶7, 784 A.2d 18,21. A fact is material when it has the potential to affect the outcome of the suit. Kenny v. Dep't of Human Services, 1999 ME 158, ¶3, 740 A.2d 560, 562. An issue is genuine if sufficient evidence supporting the claimed factual dispute exists to require a choice between the parties' differing versions of the truth at trial. Id.

Both the trial court and the appellate court undertake the same analysis of motions for summary judgment. The court first determines the elements of the cause of action at issue and then reviews the facts set forth in the parties' statements of material facts that are supported by appropriate record references. Curtis at ¶8.

M.R. Civ. P. 56 ("Rule 56") establishes the procedure the parties must follow when seeking or defending summary judgment. Rule 56 requires the moving party to file a "separate, short and concise statement of the material facts, set forth in numbered paragraphs, as to which the moving party contends there are no genuine issues to be tried." M.R. Civ. P. 56(h)(1). The party opposing summary judgment must submit a statement of material facts that are in dispute. M.R. Civ. P. 56(h)(3). Both statements must be supported by record references pursuant to Rule 56. The Court may disregard any statement of fact the parties have failed to support by a specific citation to the proper

record material. Further, the opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts. M.R. Civ. P. 56. 56(h)(4). Unless the non-moving party admits a fact, he shall support each denial or qualification by a record citation. Id. The Court deems all facts that the nonmoving party fails to properly controvert in accordance with Rule 56 as admitted. *Rogers v. Jackson*, 2002 ME 140, ¶7, 804 A.2d 379. M.R.Civ. P. 56(h)(4) provides in relevant part:

> Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, *shall be deemed admitted unless properly controverted.* (Emphasis supplied)

## A. The Plaintiff's report to U.S. Customs in February of 2001.

The Plaintiff contends that his report to U.S.Customs in February of 2001 to the effect that the Defendants might be employing Canadian workers in violation of law was a protected activity under the WPA and this report satisfied the first element of his prima facie case. The court disagrees. As indicated above, in order for the Plaintiff's report to U.S. Customs to satisfy the first required element of an action under the WPA, he must demonstrate that the report constitutes a protected activity. Under the circumstances of this case, in order to make that showing, the evidence must establish that all of the following subparts exist:

> a. The Plaintiff must have had an *objectively* (emphasis supplied) reasonable basis to believe that a violation of law was occurring.
> b. Before reporting to a public body, he must first have made his report to his employer
> c. He must have allowed his employer a reasonable opportunity to correct the reported violation of law.

Therefore, in order to satisfy the first subpart of the "protected activity" element of his prima facie case, the Plaintiff must prove that he had an objectively reasonable

basis to believe that a violation of law was occurring. He must produce proof such that a "reasonable person might have believed that the employer was acting unlawfully." Bard v. Bath Iron Works Corp. 590 A.2d 152, 155 (Me. 1991). The evidence upon which the Plaintiff relies for this showing is set forth in Paragraph 81 of the SOAMF. [11] The bases set forth in Paragraph 81 are largely the Plaintiff's subjective suspicions that flow from the January 2000 incident. It is worth pointing out that the Plaintiff had no clear evidence to establish whether the two Canadians were legally or illegally in the United States in January of 2000. According to his own account, notwithstanding that Agent Merrick told him that *to his own knowledge* the Canadians were not legal, no one ever got back to him on that point. Agent Merrick never followed up with the Plaintiff to let him know if he was able to confirm this suspicion. (Currie dep. p. 70, lines 1to 3) Assuming for arguments sake however, that the Plaintiff did have confirmation that the two Canadians had entered the United States illegally in January 2000, in the court's view, this still does not provide an objectively reasonable basis to conclude that the Canadians observed in the mill yard one year later, in February of 2001, were in this country illegally. The Plaintiff's personal beliefs that U.S. immigration authorities would never issue work visas for the kind of work that the Plaintiff assumed the Canadians were going to do is simply insufficient as a matter of law to support an objectively reasonable belief that illegal activity was occurring. Thus, the court concludes that the Plaintiff did not have an objectively reasonable basis to believe that a violation of law was occurring.

---

[11] The court would note that neither party has closely adhered to the "one fact per numbered paragraph" rule. The parties' submissions contain many paragraphs with multiple factual recitals and multiple responses that do not simply admit, deny, or qualify a single factual assertion, but rather which admit, deny, or qualify individual sentences contained within individually numbered paragraphs. This seems to the court to depart from the "summary" nature of motions for summary judgment as provided for in the rule.

The Plaintiff also cannot satisfy the third subpart of the "protected activity" element of a prima facie case. This subpart provides that in order for a report of a violation of law to a public body, such as the Plaintiff relies upon in this case, to constitute a protected activity, the claimant must do two things. First, he must report the matter to his employer *and* second, he must allow the employer a reasonable opportunity to correct the violation. If he does not do both of these things, his report to a public body cannot be regarded as a protected activity under the WPA.

The opportunity to correct the violation is an important part of the overall scheme of the WPA. The WPA was not enacted to commence a workplace game of "gotcha" between employees and employers. It was enacted to protect employee reporting of employer wrongdoing and thereby promote the desirable goal of early and informal resolutions of workplace wrongdoing with a minimum investment of time and expense. This is a goal best obtained by affording the employer the first opportunity to achieve it on a voluntary basis. (See Appeal of Bio Energy Corp. 135 N. H. 517,521 (1992).

The law only exempts the employee from making a first report to his employer and from affording the employer that opportunity to correct the violation if making the report and affording the opportunity to correct wouldn't do any good.

The Plaintiff seeks to avoid the "opportunity to correct" requirement based on that part of the law that provides:

> Prior notice to an employer *(and implicitly also the opportunity that such reporting presents to correct violations)*(not in the original text) is not required if the employee has *specific reason* (emphasis supplied) to believe that reports to the employer will not result in promptly correcting the violation, condition or practice. 26 M.R.S.A.§ 833(2).

As the "specific reason" that excuses the "prior notice/opportunity to correct" requirement, the Plaintiff points to the January 2000 incident. In essence, the Plaintiff

11

argues that because the two Canadians had quickly left the mill property a year earlier after he had broached the issue of their work status, one could conclude the two Canadians who appeared in February of 2001 were not only in this country illegally but also that there was no time to notify his employer because to take the time to give this notice would forfeit the opportunity for law enforcement to catch them. The court does not find this argument persuasive.

The evidence demonstrates that the Plaintiff received his information regarding the two Canadians being on mill property from Saucier, most probably on the weekend. The Plaintiff didn't even wait until the workweek had resumed before making his call to U.S.Customs.[12]

Nor does the court accept the argument that because the employer did not forbid the report, it permitted it. The Plaintiff reported his concerns to his supervisor. However, Varga clearly told the Plaintiff that the Canadians were legal. There is nothing about the description of the surrounding circumstances of this exchange that the court could construe as rising to the level of Varga's implied consent on behalf of the employer to waive the "opportunity to correct" provided for under the WPA and for the Plaintiff therefore to proceed immediately to make a report to federal law enforcement. Thus the court concludes that the Plaintiff did not have a legally sufficient "specific reason" to exempt himself from the "first report/opportunity to correct" requirement.

Accordingly, in the court's opinion, the Plaintiff fails to establish at least two of the three subparts of the "protected activity" element of a prima facie case under the WPA. Because the Plaintiff has failed to establish that his conduct was a protected

_____

[12] The Plaintiff also indicated that it might have been on his day off. In either event he acted within a day and even before he returned to work. This is a legally insufficient opportunity for the employer to have taken corrective action.

12

activity under the WPA, the Defendant is entitled to summary judgment on the Plaintiff's complaint to the extent that the Plaintiff relies upon his report to federal law enforcement. In the court's view, he cannot demonstrate that the report he made in February of 2001 was an action protected by the WPA.

## B. The report to DEP.

The Plaintiff presents an alternative theory that his termination was predicated on a report of an environmental violation to the DEP. The Plaintiff acknowledges that he did not make this report but argues that the Defendants' perception that it was the Plaintiff who made the report is sufficient to entitle the Plaintiff to the protections of the law. In the court's view, the report to DEP may very well constitute a protected action for someone, but not for the Plaintiff. The evidence is clear that the Plaintiff made no such report. The first required element of proof for a whistleblower's claim under the WPA is to prove that the claimant has engaged in activity protected by the WPA. Stanley at ¶11. The Plaintiff argues (but offers little proof) that the Defendant wrongfully believed that he had made the report to DEP and fired him for that reason. The court agrees with U.S. Magistrate Judge Kravchuk's view that "a basic prerequisite to a whistleblower protection claim is that the plaintiff has actually blown the proverbial whistle." Tripp v. Scott Cole and The Town of Bethel, 2004 U.S. Dist. LEXIS 25124, Civil No. 03-289-P-S. Irrespective of the Defendants' motivations, if the Plaintiff didn't blow the whistle, he cannot claim that act for himself as a protected activity. Thus, again, the court must conclude that the Plaintiff has failed to establish a prima facie case upon this second theory.

## C. Speeding Reports

Finally, the Plaintiff appears to contend that his reports of Ouellette's speeding also constitute a protected activity and that a causal connection exists between his reports of an inherent safety risk to his employer and his termination.[13]

In order for the Plaintiff to establish his prima facie case, he must not only establish that he engaged in a protected activity, he must also demonstrate that a causal relationship exists between his protected activity and an adverse employment action. The court agrees that the Plaintiff's reports would fall within the definition of a protected activity, but the remaining question is whether the Plaintiff has sufficiently established the element of causation to make out the third element of his prima facie case. The court concludes that he has not done so.

The court recognizes that the question of whether one thing is the proximate cause of another is generally a question of fact, and a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of causal connection. Kaechele v. Kenyon Oil Co., Inc., 2000 ME 39, P17, 747 A.2d 167, 173. Nevertheless, if the evidence produced by the Plaintiff in opposition to a motion for summary judgment would, if produced at trial, entitle the Defendant to a judgment as a matter of law, the Defendant is entitled to a summary judgment. Corey v. Norman, Hanson & DeTroy, 1999 ME 196, P7, 742 A.2d 933, 937-38.

The Plaintiff's evidence presented in support of this element of his claim is found in ¶'s 84 and 85 of the SOAMF. These two paragraphs set forth the history

---

[13] The Defendant addressed the insufficiency of the "speeding allegations" in his legal memorandum, but the court finds no response to this issue in the Plaintiff's legal memorandum.

of the Plaintiff's reports of Ouellette's speeding in the mill yard.[14] The Plaintiff appears to contend that the causal connection is established by inference.

A defendant is entitled to a summary judgment if there is so little evidence tending to show that the defendant's acts or omissions were the proximate cause of the plaintiff's damages that the jury would have to engage in conjecture or speculation in order to return a verdict for the plaintiff. Merriam v. Wanger, 2000 ME 159, P10, 757 A.2d 778, 781. The mere possibility of such causation is not enough, and when the matter remains one of pure speculation or conjecture, or even if the probabilities are evenly balanced, a defendant is entitled to a judgment. Id. P 8, 757 A.2d at 781.

Even the Plaintiff had to acknowledge that the connection between his reports of Ouellette's speeding and his termination didn't leave the realm of mere possibility. (See Currie dep. 133, lines 1 to 3). The court must agree with the Defendant that the Plaintiff has failed to supply any concrete evidentiary materials on this point sufficient to take the issue out of the realm of speculation and accordingly, the court concludes that the Plaintiff has also failed to make out a prima facie case based on the "speeding reports".

## 2. Count III: Tortious Interference With Contractual Advantage

Plaintiff acknowledges that if the Defendants were found to be a "single employer" as he has alleged in Count I, then he does not have a claim for tortious

---

[14] These two paragraphs contain multiple factual assertions and call into question whether the Plaintiff has complied with the rule's "separate, short, and concise" requirements.

interference. However, if Irving and Industrial are found to be separate and distinct entities, then he claims in the alternative that Irving has wrongfully interfered with his employment contract with Industrial.

In order to sustain this cause of action for tortuous interference with an advantageous relationship, a claimant must establish:

1. The existence of a valid contract or prospective economic advantage,
2. Interference with that contract or advantage through *fraud, or intimidation,* (emphasis supplied) and
3. Damages proximately caused by the interference. James v. MacDonald, 1998 ME 148, ¶7, 712 A.2d 1054, 1057.

The Law Court has recently stated in *Stanley* that,

"summary judgment is properly granted where a plaintiff will have the burden of proof on an essential issue at trial, and it is clear that the defendant would be entitled to a judgment as a matter of law at trial if the plaintiff presented nothing more than was before the court at on the motion for summary judgment. Stanley at ¶24.

The Plaintiff has presented no evidence at all that the Defendants have engaged in any kind of fraudulent activity. The Plaintiff argues rather that, Defendant Irving "intimidated" Industrial into firing him. The Plaintiff argues that Paragraph 87 of his SOAMF supports this conclusion.

Paragraph 87 appears at pages 26, 27, 28 and 29 of the SOAMF. In the court's view, this four-page paragraph does not comply with the "separate, short, and concise" requirement of M.R.Civ.P. (h)(1) and is vulnerable to being disregarded in the court's discretion. Nonetheless, the court has reviewed this paragraph and while it might be possible to conclude that because Irving had the

power to choose to contract for security with Industrial or not, it therefore enjoyed economic leverage over Industrial, the court can find no evidence that Irving ever exercised that advantage of power or otherwise engaged in "intimidation" of Industrial for the purpose of getting Industrial to fire the Plaintiff. There is simply no evidence in the record that Irving "made it clear" to Industrial that if Johnson didn't fire the Plaintiff it would lose the security contract. (Compare Pombriant v. Blue Cross/Blue Shield of Maine, 562 A.2d 656, 659 (Me. 1989) In short, the court would have to engage in impermissible speculation in order to make the causal connection suggested by Plaintiff

In the absence of some proof or evidence of actual fraud or intimidation, the Plaintiff cannot sustain his claim for tortuous interference with contractual advantage.

The entry shall be: The Defendants' Motion for Summary Judgment is granted; Judgment is entered for the Defendants on Counts I, II and III of the Plaintiff's complaint together with costs.[15]

March 17, 2005

JUSTICE, SUPERIOR COURT

---

[15] The decision of the court renders the Defendant's Pending Motion to Strike moot and it is therefore dismissed.