STATE OF MAINE                          SUPERIOR COURT
CUMBERLAND, ss.                         CIVIL ACTION
                                        DOCKET NO: CV-09-540
                                        RAC - CUM- 12/15/2011

IRVING OIL, MARKETING, Inc.,

                Plaintiff,

        v.                                              **ORDER**

CANAAN ONE STOP, LLC

and

BRETT DAVIS

                Defendants

Plaintiff Irving Oil, Marketing, Inc., moves for partial summary judgment on its

complaint and against defendants Canaan One Stop, LLC, and Brett Davis'

counterclaim.

## BACKGROUND

In 2006, plaintiff Irving Oil Marketing, Inc. (Irving) and defendant Canaan

One Stop, LLC (One Stop) entered into a Dealer Supply Agreement

("Agreement"), effective March 1, 2006. (Pl.'s S.M.F. ¶ 4.) In relevant part, the

agreement:

- granted One Stop a license to market and sell motor fuel under the
  "Irving" trademark (*id.*);

- required Irving to sell to One Stop and One Stop to purchase and receive
  from Irving certain minimum quantities of Irving's fuel products (*id.*);

- required One Stop to pay all amounts due to Irving (pl.'s S.M.F. ¶ 15);

1

- prohibited One Stop from offering for sale any motor fuel products other than those provided by Irving (pl.'s S.M.F. ¶ 6); and

- prohibited One Stop from cross-hauling (*id.*).

After the Agreement went into effect there were several disagreements between Irving and One Stop regarding payments. (Pl.'s S.M.F. ¶ 8.) In order to resolve these disagreements the two parties entered into a Settlement Agreement ("Settlement") that required One Stop to abide by the terms of the Agreement. (Pl.'s S.M.F. ¶¶ 9, 10.) In the Settlement, Irving agreed to reduce One Stop's indebtedness in consideration of One Stop's execution of a Promissory Note ("Note") in favor of Irving in the amount of $250,000. (Pl.'s S.M.F. ¶ 11.)

Pursuant to the Note, One Stop agreed to pay Irving three-cents per gallon of the fuel products Irving sold to One Stop until March 1, 2013. (Pl.'s S.M.F. ¶ 12.) Within thirty days of March 1, 2013, One Stop would owe Irving a lump sum payment for the remaining obligation on the Note. (*Id.*) The Note also contained an acceleration clause allowing Irving to make the full amount due on demand if One Stop defaulted on the Note or Agreement. (Pl.'s S.M.F. ¶ 13.)

As part of the Settlement, defendant Brett Davis[1] executed a Guaranty in favor of Irving to secure the Note. (Pl.'s S.M.F. ¶ 14.) The Settlement also contained a provision regarding I-24 cards.[2] (Pl.'s S.M.F. ¶ 15.) One Stop was not approved to accept I-24 cards, but other retailers of Irving diesel fuel located in the region did have approval to accept the I-24 card. (Def.'s S.M.F. ¶¶ 12–13.)

---

[1] Davis is the sole owner and principal operating officer of One Stop. (Def.'s S.M.F. ¶ 36.)

[2] An I-24 card is a way for trucking companies to pay at certain Irving gas stations. It gives the buyer access to a standard price, which is typically (but not always) lower than what is charged if the trucker pays with a commercial fleet card. (Flynn Dep. at 38: 12–23.)

2

Under the Settlement, Irving agreed to consider allowing One Stop to accept I-24 cards and at the time this motion was filed Irving had made progress towards approving One Stop to accept the card. (Pl.'s S.M.F. ¶¶ 15, 26, 27.)

Prior to June 2009, Robin Crawford Wood Contracting ("Crawford") was One Stop's biggest customer for diesel fuel. (Def.'s S.M.F. ¶ 1.) In Spring 2009 Irving discussed the I-24 card with Crawford and on April 21, 2009, Crawford opened an account for the card. (Def.'s S.M.F. ¶¶ 9, 11.) By June 2009, Crawford's monthly purchases of diesel fuel from One Stop had decreased to zero.[3] (Def.'s S.M.F. ¶ 15 *qualified by* Opp. Def.'s S.M.F. ¶ 15.)

Another clause of the Settlement stated that One Stop had "permission to purchase and transport motor fuel products from terminals in Searsport, South Portland and Portsmouth." (Def.'s S.M.F. ¶ 33.) One Stop claims, and Irving denies, that Irving refused One Stop access to the Portsmouth terminal. (Def.'s S.M.F. ¶ 35; Opp. Def.'s S.M.F. ¶ 35.)

In June 2009 several of One Stop's payments were returned for insufficient funds. (Def.'s S.M.F. ¶ 19.) On June 12, 2009, One Stop received a letter from Irving stating that it was "lifting privileges at all terminals" until it received a payment of $105,000, at this point Irving stopped delivering fuel products to One Stop. (Def.'s S.M.F. ¶¶ 23–24.) Around June 15, 2009, One Stop began cross-hauling and purchasing fuel products from providers other than Irving. (Pl.'s S.M.F. ¶ 20, Def.'s S.M.F. ¶¶ 24–25.)

When Irving stopped providing fuel products to One Stop, Irving also stopped receiving periodic payments of three-cents per gallon. (Pl.'s S.M.F. ¶ 21;

---

[3] Irving qualifies this fact by pointing out that Irving suspended One Stop's credit and lifting privileges in June 2009. (Opp. Def.'s S.M.F. ¶ 15.)

3

Opp. Pl.'s S.M.F. ¶ 21.) On June 23, 2009, One Stop received a letter from Irving stating that One Stop had defaulted on the Agreement and Irving was terminating the Agreement effective September 23, 2009. (Def.'s S.M.F. ¶¶ 28–29.) By the end of August 2009, One Stop had paid Irving what it had owed dating back to June 2009. (Def.'s S.M.F. ¶ 26.) Around August 25, 2009, One Stop received another letter from Irving demanding that One Stop cease and desist cross-hauling, and that One Stop and Davis pay the amount due under the Agreement and the Note. (Pl.'s S.M.F. ¶ 25.) Irving filed a complaint on September 29, 2009.

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted if there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c). The court will consider "only the portions of the record referred to, and the material facts set forth in the [M.R. Civ. P. 56(h)] statements." *F.R. Carroll, Inc. v. TD Bank, N.A.*, 2010 ME 115, ¶ 8, 8 A.3d 646 (quotation marks omitted). "Summary judgment is appropriate when review of the parties' statements of material facts and the referenced record evidence, considered in the light most favorable to the non-moving party, indicates that no genuine issue of material fact is in dispute." *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 23, 980 A.2d 1270. "[W]hen facts, though undisputed, are capable of supporting conflicting yet plausible inferences – inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws – then the choice between those inferences is not for the

court on summary judgment." *F.R. Carroll, Inc.*, 2010 ME 115, ¶ 8, 8 A.3d 646 (quotation marks omitted).

## II.    Counterclaim – Tortious Interference

In its counterclaim, One Stop argues that Irving tortiously interfered with One Stop's advantageous economic or business relationship with Crawford. (Opp'n Mot. Summ. J. 5–6.) Irving allegedly interfered by convincing Crawford to accept an I-24 card, even though Crawford could not use the card and its purported benefits at One Stop. (*Id.*) A tortious "[i]nterference with an advantageous relationship requires the existence of a valid contract or prospective economic advantage, interference with that contract or advantage through fraud or intimidation, and damages proximately caused by the interference." *Barnes v. Zappia*, 658 A.2d 1086, 1090 (Me. 1995). Since Crawford was One Stop's best customer, a rational factfinder could find that they had an advantageous relationship with a "prospective economic advantage." (Def.'s S.M.F. ¶ 1.) Additionally, One Stop was probably damaged since Crawford spent less money at One Stop after signing up for an I-24 card. (Def.'s S.M.F. ¶ 15.) Finally, a rational factfinder may find that the interference was through intimidation.

"Interference by intimidation involves unlawful coercion or extortion." *Rutland v. Mullen*, 2002 ME 98, ¶ 16, 798 A.2d 1104. One Stop argues that Irving intimidated Crawford into becoming an I-24 card user by telling him that it is the only way for him to get the preferential rates associated with the card.[4] (Opp'n Mot. Summ. J. 5–6.) One Stop relies on *Pombriant v. Blue Cross/Blue Shield of Me.*,

---

[4] Davis' affidavit supports these claims, but it is unclear how he knows what Irving told Crawford. As the non-moving party the court makes inferences in One Stop's favor.

562 A.2d 656 (Me. 1989), to show that this behavior is intimidation. In *Pombriant*, Blue Cross had a contract with insurance broker Pombriant to allow him to sell insurance in Maine, and they implied to him that, despite a mistake they had made, he was customer Bennett's broker. *Id.* at 658. Blue Cross then gave the Bennett account to Johnson, another insurance broker, instead. *Id.* The Law Court found that a jury could reasonably find "that Blue Cross procured the breach of contract between Pombriant and Bennett by the intimidating means of making it clear to Bennett that the only manner in which it could avail itself of Blue Cross's lower rates for the desired insurance would be by using the brokerage services of Johnson." *Id.* at 659. Similarly, in this case, a rational factfinder could find, based on the disputed facts, that Irving tortiously interfered with One Stop's business relationship with Crawford.

### III. Complaint – Breach of Contract

In its motion for summary judgment Irving argues that One Stop breached the Agreement, the Settlement, and the Note. Additionally, Irving argues that Davis breached the Guaranty associated with the Note. In violation of the Agreement, Irving claims that One Stop failed to make timely payments and participated in cross-hauling. (Compl. ¶¶ 29–30.) Similarly, Irving claims that One Stop breached the Settlement, Note, and Guaranty by failing to pay the $242,209.03 it owes Irving. (Compl. ¶¶ 36, 40, 45.)

#### A. Admitted facts surrounding One Stop's alleged breach of contract

One Stop admits that the Agreement requires timely payments and prohibits cross-hauling fuel products. (Pl.'s S.M.F. ¶ 6; Opp. Pl.'s S.M.F. ¶ 6.) Additionally, One Stop admits that pursuant to the Settlement it must abide by the Agreement and execute a Note for $250,000. (Pl.'s S.M.F. ¶¶ 10, 11; Opp. Pl.'s

6

S.M.F. ¶¶ 10, 11.) One Stop admits that the Note requiring periodic payments was executed and Davis executed the Guaranty to secure the Note. (Pl.'s S.M.F. ¶¶ 12, 14; Opp. Pl's S.M.F. ¶¶ 12, 14.) Finally, One Stop admits that after the Settlement it failed to make payments under the original Agreement, it started cross-hauling, it did not make the required periodic payments on the Note, and Davis did not cover the missed payments. (Pl.'s S.M.F. ¶¶ 18, 20, 21, 23; Opp. Pl's S.M.F. ¶¶ 18, 20, 21, 23.) The only claim that One Stop directly disputes is that it owes Irving $242,209.03. (Opp. Pl's S.M.F. ¶ 28.) Instead, One Stop insists that the amount should be reduced due to Irving's own breach of contract and the tortious interference allegations set forth in the counterclaim, discussed above. (*Id.*)

## B. One Stop's claims that Irving breached the contracts.

One Stop argues that Irving's claims are barred by Irving's own material breaches. (Opp'n Mot. Summ. J. 7.) A material breach of contract "is a non-performance of a duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end." *Jenkins, Inc. v. Walsh Bros.*, 2001 ME 98, ¶ 13, 776 A.2d 1229 (quoting *Associated Builders, Inc. v. Coggins*, 1999 ME 12, ¶ 6, 722 A.2d 1278 (quotation marks omitted)). Determining whether a breach is material is a question of fact. *Id.*

One Stop claims that Irving materially breached the contracts in three ways. First, Irving refused One Stop access to the Portsmouth terminal as required by the Settlement. (Opp'n Mot. Summ. J. 7; *see also* Opp. Def.'s S.M.F. ¶ 35.) Second, Irving stopped providing diesel fuel products after One Stop failed to make required payments, thus forcing One Stop to cross-haul and fail to pay the three-cents per gallon payments towards the Note. (Opp'n Mot. Summ. J. 8,

7

10.) Third, Irving did not practice good faith in executing the Agreement by tortiously interfering with One Stop's business relationship with Crawford. (Opp'n Mot. Summ. J. 8.) This interference made it difficult for One Stop to make the necessary payments. (*Id.*)

The claim that Irving breached the Settlement by denying access to the Portsmouth terminal received little coverage from either party. One Stop simply said that they were denied access and Irving replied that they do not have enough information about the denial to properly respond. (Opp. Def.'s S.M.F. ¶ 35.) Additional undisputed facts are needed to understand the impact of this alleged breach and whether it is material.

One Stop's arguments regarding the stopped fuel deliveries are not convincing. While the Agreement and the Settlement require Irving to deliver fuel products, there is no indication that Irving is required to deliver fuel products if One Stop is not paying for the products. (Opp. Def.'s S.M.F. ¶ 31.)

One Stop's strongest argument is that Irving lacked good faith when it interfered with the business relationship between One Stop and Crawford. As discussed regarding the counterclaim, a rational factfinder could find that Irving tortiously interfered with the business relationship. Under the UCC, a contract for the sale of goods, such as fuel, "imposes an obligation of good faith in its performance and enforcement." 11 M.R.S. § 1-1304 (2010). "Good faith is a question of fact." *Woods v. Bath Industr. Sales, Inc.*, 549 A.2d 1129, 1132 (Me. 1988). One Stop argues that Irving's tortious interference with One Stop's relationship with Crawford indicates that Irving acted in bad faith. (Opp'n Mot. Summ. J. 9.) As a result, the issue of Irving's breach of the Agreement, and whether it is material, is a question of fact for the factfinder.

8

### C. The impact of Irving's alleged breaches on the complaint's counts

If Irving did commit a material breach of the contract by acting in bad faith when it offered the I-24 card to Crawford, or by refusing One Stop access to the Portsmouth terminal, then it is necessary to determine the impact of these breaches. Both of these breaches may have occurred prior to One Stop missing its first payment under the settlement agreement.[5]

If Irving acted in bad faith and interfered with One Stop's ability to make the necessary payments to Irving after the Settlement went into effect then it breached both the Settlement and the Agreement. (*See* Pl.'s S.M.F. ¶ 10 (incorporating the Agreement into the Settlement).) Likewise, if a factfinder finds that Irving committed a material breach of the Settlement, then One Stop could argue that this breach is also a material breach of the Note, and thus the Guaranty. The Note requires three-cents per gallon of fuel product payments, but these payments are not possible if Irving has stopped delivering fuel. (Pl.'s S.M.F. ¶ 12.) As a result, all of the counts depend on a factfinder's view of whether Irving's actions were in good faith.

**The entry is:** The plaintiff's motion for summary judgment is denied.

DATE: _December 15, 2011_

_____
Roland A. Cole
Justice, Superior Court

---

[5] It is unclear from the facts when One Stop was denied access to the Portsmouth Terminal.

9

IRVING OIL MARKETING INC VS CANAAN ONE STOP LLC ET AL

UTN:AOCSsr  -2009-0108084                    CASE #:PORSC-CV-2009-00540
--------------------------------------------------------------------------

SEL VD                                  REPRESENTATION TYPE       DATE

01 0000002864 ATTORNEY:HOBSON, JOHN

ADDR:ONE CANAL PLAZA SUITE 900 PO BOX 426 PORTLAND ME 04112-0426

    F FOR:IRVING OIL MARKETING INC              PL        RTND    09/29/2009


02 0000000615 ATTORNEY:MILLS, S PETER

ADDR:263 WATER STREET PO BOX 9 SKOWHEGAN ME 04976-0009

    F FOR:CANAAN ONE STOP LLC                   DEF       RTND    11/06/2009

    F FOR:BRETT DAVIS                           DEF       RTND    11/06/2009