2007 ME 12

**Herschel CURRIE**

v.

**INDUSTRIAL SECURITY, INC., et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 23, 2006.
Decided: Jan. 16, 2007.

Arthur J. Greif (orally), Julie D. Farr, Gilbert & Greif, P.A., Bangor, for plaintiff.

James R. Erwin (orally), Joanne H. Pearson, Pierce Atwood, LLP, Portland, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

DANA, J.

[¶ 1] Herschel Currie appeals from a summary judgment entered in the Superior Court (Aroostook County, *Hunter, J.*) in favor of Industrial Security, Inc. (ISI) and

Irving Forest Products, Inc. (IFPI). Currie contends that the court erred in finding that the statements of material facts did not generate genuine issues of material fact with respect to his claims that ISI and IFPI violated the Maine Human Rights Act, 5 M.R.S. §§ 4551–4634 (2005) (MHRA), and the Whistleblowers' Protection Act, 26 M.R.S. §§ 831–840 (2005)(WPA), and that IFPI tortiously interfered with his contractual relationship with ISI. Because we agree, we vacate the judgment.

## I. BACKGROUND

[¶ 2] The following facts are undisputed, except as noted. Currie was a security guard at IFPI's Pinkham Lumber Mill in Ashland. Prior to May 2000, Currie was an employee of Hall Security. In May 2000, after ISI obtained the contract to provide security for the Pinkham Lumber Mill, Currie became an employee of ISI. He claims that, in July 2001, he was unlawfully discharged for making (1) a report to Border Patrol regarding unauthorized workers; (2) internal reports regarding unsafe driving in the mill yard; and (3) an internal report regarding the dumping of paint thinner.

### A. The Report Regarding Unauthorized Workers

[¶ 3] In January 2000, two Canadian employees of Industrial Security Limited (ISL is the Canadian counterpart of ISI)[1] arrived at the mill and asked Currie to assist them in performing vehicle checks. Currie, suspecting that the Canadians were not authorized to work in the United States, contacted a manager, who suggested that Currie contact Customs. Currie contacted Customs the following day, and received a return call from Border Patrol Agent Merrick, whom Currie claims told him that " 'to his knowledge neither [Canadian] had the right to work in the United States.' "

[¶ 4] In February 2001, Currie received a call at home from an IFPI employee reporting that two Canadian ISL employees had arrived at the mill and he was wondering whether the two were authorized to work in the United States. Currie called Steve Varga, an ISL supervisor. Although Varga assured Currie that the Canadians were authorized, Currie told Varga that he was going to call Border Patrol.[2] Currie called Border Patrol and, upon returning to work, was allegedly told that the Canadians had been arrested and deported.

### B. The Reports Regarding Unsafe Driving and the Dumping of Paint Thinner

[¶ 5] Throughout his employment at the mill, Currie lodged numerous complaints that Alain Ouellette, a regional manager for J.D. Irving, Limited, drove through the mill yard at excessive rates of speed.

[¶ 6] Around June 2001, Currie complained to management about an incident involving the dumping of paint thinner. Although Currie was initially accused of having reported the dumping to the Department of Environmental Protection (DEP), the parties now agree that Currie did not report the dumping to the DEP.[3]

---

1. ISL provides security for various facilities owned by J.D. Irving, Limited, in Canada.

2. Although paragraph 78 of Currie's statement of additional material facts references Customs rather than Border Patrol, it appears from paragraph 50 of ISI and IFPI's statement of material facts and elsewhere that this was in error.

3. ISI and IFPI assert that, in the spring of 2001, the DEP received an anonymous report that the mill was improperly disposing of paint thinner. Currie denies this statement

## C. Currie's Discharge

[¶ 7] In March 2001—subsequent to Currie's reports regarding the unauthorized workers and Ouellette's unsafe driving, but prior to his report regarding the dumping of paint thinner—Ouellette and Johnson, Currie's supervisor at ISI, met and discussed the possibility of Currie's discharge. Although Ouellette wanted Johnson to discharge Currie, Johnson resisted because he believed Currie was doing a good job. Ouellette recommended Currie's firing a number of times between March and July 2001.

[¶ 8] ISI and IFPI assert that the discharge decision was made at this March 2001 meeting, whereas Currie asserts that it was made at a later, July 2001, meeting. Currie asserts that, in July 2001 on the morning of his discharge, Ouellette and Johnson met and discussed Currie's February 2001 report regarding the unauthorized workers as well as the dumping of paint thinner.[4] Currie believes that his discharge was motivated not only by the report regarding the unauthorized workers but also by the reports regarding Ouellette's unsafe driving and the dumping of paint thinner.

[¶ 9] On July 18, 2001, Johnson fired Currie. At the time of Currie's firing, however, based on what he then knew, Johnson did not want to fire him. Johnson expressed this sentiment to Currie when he fired him, but refused to tell him the reason for the firing. Moreover, Johnson admitted that had Ouellette told him that he no longer wanted Currie fired, he would not have fired him. Johnson never had a problem with Currie during Currie's employment.

[¶ 10] Following his discharge, Currie filed a complaint with the Maine Human Rights Commission pursuant to 26 M.R.S. § 834-A (2005), received a right to sue letter pursuant to 5 M.R.S. § 4612(6) (2005), and commenced this action. Currie alleged that ISI and IFPI—acting either as an integrated entity or as principal and agent, respectively—had violated the MHRA and WPA. Currie further alleged that, even if IFPI was neither integrated with nor an agent of ISI, it had tortiously interfered with his contractual relationship with ISI. ISI and IFPI moved for a summary judgment,[5] the court granted their motion, and Currie brought this appeal.

## II. DISCUSSION

[¶ 11] A summary judgment is appropriate when the portions of the record referenced in the statements of material fact disclose no genuine issues of material fact and reveal that one party is entitled to judgment as a matter of law. M.R. Civ. P. 56(c).

We review the grant of a motion for summary judgment de novo . . . consider[ing] the evidence and reasonable in-

---

on the basis that, although it is supported by citation to an affidavit, the author of the affidavit had no personal knowledge of the report to the DEP.

4. ISI and IFPI claim that, although the dumping of paint thinner was discussed at the July 2001 meeting, the discussion was not related to Currie's discharge.

5. It should be noted that many of Currie's statements of additional material facts are not "separate, short, and concise." Although the requirement that statements be "separate, short, and concise" is explicitly mentioned in reference to the moving party's statement of material facts and to the non-moving party's opposing statement of material facts, M.R. Civ. P 56(h)(1), (2), it applies with equal force to the non-moving party's statement of additional material facts. It is, thus, within our discretion to disregard any non-compliant statements. *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 29, 864 A.2d 169, 179.

ferences that may be drawn from the evidence in the light most favorable to the party against whom the summary judgment has been granted in order to determine if the parties' statements of material facts and referenced record evidence reveal a genuine issue of material fact.

*Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178, 1179.

### A. The MHRA and WPA Claims

#### 1. Elements of an MHRA and WPA Claim

■ [¶ 12] The MHRA prohibits employers from discriminating against employees because of actions protected under the WPA. 5 M.R.S. § 4572(1)(A) (2005). To prevail on a WPA claim, an employee must show that (1) he engaged in activity protected by the WPA; (2) he experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action. *Stanley v. Hancock County Comm'rs*, 2004 ME 157, ¶ 11, 864 A.2d 169, 173. Title 26 M.R.S. § 833(1)(A) (2005) provides:

> **1. Discrimination prohibited.** No employer may discharge ... an employee ... because:
>
> **A.** The employee, acting in good faith ... reports orally or in writing to the employer or a public body what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of this State, a political subdivision of this State or the United States.

Title 26 M.R.S. § 833(2) provides:

> **2. Initial report to employer required; exception.** Subsection 1 does not apply to an employee who has reported ... a violation, or unsafe condition or practice to a public body, unless the employee has first brought the alleged violation, condition or practice to the attention of a person having supervisory authority with the employer and has allowed the employer a reasonable opportunity to correct that violation, condition or practice.
>
> Prior notice to an employer is not required if the employee has specific reason to believe that reports to the employer will not result in promptly correcting the violation, condition or practice.

#### 2. Summary Judgment in MHRA and WPA Claims

[¶ 13] Our construction of the MHRA and WPA has been guided by federal law, *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253, 1261 (Me.1979) (stating that, in enacting the MHRA, the Maine Legislature "intended the courts to look to the federal case law to 'provide significant guidance in [construing the] statute'") (quoting *Maine Human Rights Comm'n v. Local 1361, United Paperworkers Intern. Union AFL-CIO, Me.*, 383 A.2d 369, 375 (Me.1978)), and we have previously "evaluate[d] WPA claims with the 'shifting burdens' analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)," *Stanley*, 2004 ME 157, ¶ 12, 864 A.2d at 174.

#### 3. Analysis

##### a. The Report Regarding Unauthorized Workers

■ [¶ 14] ISI and IFPI claim that Currie was discharged for his February 2001 report to Border Patrol. Currie agrees this was one of the causes of his discharge. ISI and IFPI assert that the report was not protected under the WPA because Currie did not have reasonable cause to believe that a violation of law had occurred

and, in any event, did not provide ISI and IFPI with a reasonable opportunity to correct the alleged violation prior to making the report. We consider ISI and IFPI's arguments and, finding them unpersuasive, engage in the remainder of the summary judgment analysis.

i. Reasonable Cause to Believe that a Violation of Law Had Occurred

[¶ 15] Currie asserts that, because he reasonably believed that the Canadians who came to the mill in January 2000 were unauthorized, and knew that one of the Canadians who came in January 2000 returned in February 2001, he had reasonable cause to believe that the Canadians who came in February 2001 were unauthorized.

[¶ 16] Currie's assertion that he reasonably believed that the Canadians who came to the mill in January 2000 were unauthorized is supported by the following: the two evaded Currie's questions regarding their authorization; when Currie said that he was going to call a supervisor, they left the mill; and Border Patrol Agent Merrick later told Currie that "to his knowledge neither [of them] had the right to work in the United States."[6] Although ISI and IFPI dispute the above statements, each is properly supported by a citation to the record. If proved at trial, the statements would support a finding that Currie reasonably believed that the Canadians who came to the mill in January 2000 were unauthorized.

[¶ 17] Although the parties agree that Currie knew the names of the Canadians who came to the mill in January 2000, they dispute whether he knew the names of the Canadians who came in February 2001. Currie's assertion that he knew the names of the Canadians who came in February 2001 is supported by portions of his deposition testimony (cited in his statements of material facts) indicating that, when he called Merrick in February 2001, he gave Merrick the Canadians' names. If proved at trial, this assertion would support a finding that Currie knew, prior to calling the Border Patrol in February 2001, that one of the same Canadians came to the mill in both January 2000 and February 2001. This knowledge would create a sufficient nexus between the two incidents to provide Currie with reasonable cause to believe that the Canadians who came to the mill in February 2001 were unauthorized.

ii. Reasonable Opportunity to Correct the Violation

[¶ 18] Currie contends that Varga's assurances that the Canadians who came to the mill in February 2001 were authorized provided him with a "specific reason" to believe that ISI and IFPI would not take corrective action, and thereby exempted him from providing them with more of an opportunity to take such action.

[¶ 19] The parties agree that, prior to contacting Customs, Currie told Varga that "he didn't believe that the two [Canadians] were legally able to work within the United States" and he intended to call Border Patrol. Varga's continued assurances that the Canadians were authorized provided Currie with a specific reason to believe that ISI and IFPI would not take corrective action. Currie has presented

---

6. Although the parties dispute the extent of Merrick's investigation and the content of his conversation with Currie, the above quotation is supported by a citation to Currie's deposition. Although ISI and IFPI argue that Currie's testimony as to Merrick's statement is hearsay, the statement is offered as evidence of Currie's belief that the Canadians were unauthorized rather than as proof that the Canadians were actually unauthorized. It is, therefore, not hearsay. *See* M.R. Evid. 801(c).

facts from which a fact-finder could conclude that he was exempt from providing them with a further opportunity to take such action.

### iii. Remaining Summary Judgment Analysis

[¶ 20] On the basis of the foregoing, we conclude that Currie's statements, if proved, would support a finding that his report regarding the unauthorized workers was protected activity that was, at least, a cause of his discharge. Because Currie successfully set forth a prima facie case, and ISI and IFPI failed to articulate a legitimate, non-discriminatory reason for his discharge, the summary judgment must be vacated on this issue.

### b. The Reports Regarding Unsafe Driving

[¶ 21] ISI and IFPI argue that the statements of fact are insufficient to support a finding that Currie's reports regarding Ouellette's unsafe driving were causally connected to his discharge. We consider this argument and, finding it unpersuasive, engage in the remainder of the summary judgment analysis.

### i. Causal Connection

[¶ 22] "Proof of conduct protected by the WPA[,] . . . followed in close proximity by an adverse employment action, gives rise to an inference that a causal connection is established." *DiCentes v. Michaud*, 1998 ME 227, ¶ 16, 719 A.2d 509, 514–15. Establishment of such an inference is sufficient to meet the employee's initial burden. *Id.*

[¶ 23] The statements indicate that Ouellette was aware of Currie's reports regarding his driving and that Ouellette generally avoided Currie. They further indicate that, as soon as Ouellette was in a position to recommend Currie's discharge, he did so. Although the parties dispute when the discharge decision was actually made, the discharge itself occurred approximately four months after Ouellette's initial recommendation, during which period Ouellette remained vocal about his desire to discharge Currie. The temporal proximity between Currie's reports regarding Ouellette's unsafe driving, Ouellette's recommendation to discharge Currie, and Currie's actual discharge is sufficient to raise an inference of causation. Currie has, therefore, successfully set forth a prima facie case.

### ii. Remaining Summary Judgment Analysis

[¶ 24] We next consider whether ISI and IFPI articulated a legitimate, non-discriminatory reason for Currie's discharge. *Stanley*, 2004 ME 157, ¶ 12, 864 A.2d at 174. ISI and IFPI assert that Currie was discharged because of his report regarding the unauthorized workers rather than because of his reports regarding Ouellette's driving. If, at trial, the fact-finder concludes that Currie's report regarding the unauthorized workers is not protected activity, it would provide a legitimate, non-discriminatory reason for his discharge. Even if it provided such a reason, however, Currie's statements, if proved, would support a finding that his reports regarding Ouellette's driving also motivated his discharge. The summary judgment must, therefore, be vacated on this issue.

### c. The Report Regarding the Dumping of Paint Thinner

[¶ 25] ISI and IFPI argue that Currie's report regarding the dumping of paint thinner was not protected because it was not a "report" within the meaning of the WPA and, in any event, was not made "in good faith." We consider these arguments

and, finding them unpersuasive, engage in the remainder of the summary judgment analysis.

### i. A "Report" Within the Meaning of the Act

[¶ 26] ISI and IFPI assert that, at the time of Currie's internal report, another employee had already reported the dumping to the DEP and management was already aware of the situation.[7] The DEP allegedly received a report regarding the dumping in the spring of 2001, and Currie reported the dumping to management around June 2001. Although the statements do not reveal exactly when ISI and IFPI learned of the dumping, they indicate that Ouellette learned of a DEP investigation regarding the dumping at some point between May and July 2001. Although ISI and IFPI assert that they were aware of the alleged dumping prior to Currie's report, Currie asserts that one of the managers to whom he reported "acted like he was astonished" upon hearing what had occurred. Currie's statements, if believed, would support a finding that management first learned of the dumping through his report. The report is, therefore, a "report" within the meaning of the WPA.

### ii. A Report Made "in Good Faith"

[¶ 27] ISI and IFPI assert that Currie's report to management was made solely to disclaim responsibility for the report to the DEP. Currie's deposition testimony, however, which is cited in his statements of material facts, indicates that his report was motivated, at least in part, by a desire to prevent ISI and IFPI from burning the wood chips on which the paint thinner had been dumped. If believed, this assertion would support a finding that Currie's report was made in good faith.

### iii. Remaining Summary Judgment Analysis

[¶ 28] Having concluded that the statements, if established, would support a finding that Currie's report was protected activity, we consider whether it caused his discharge. ISI and IFPI argue that causation cannot be established because the discharge decision was made in March 2001 and the report was made around June 2001. Viewing the facts in the light most favorable to Currie and assuming that the discharge decision was made in July 2001, however, there is sufficient temporal proximity between his paint thinner report and his discharge to create an inference of causation between the report and his discharge. There is additional evidence of causation in that, at the meeting on the morning of Currie's discharge, Ouellette and Johnson discussed the paint thinner dumping. Currie's statements, if proved, would support a finding that the report contributed to his discharge. We, therefore, find that Currie successfully set forth a prima facie case.

[¶ 29] Even if, at trial, the fact-finder concludes that Currie's report regarding the unauthorized workers provides a legitimate, non-discriminatory reason for

---

7. The WPA does not explicitly state that a report is not protected unless it is the initial report. ISI and IFPI rely on a Minnesota Court of Appeals case for the proposition that "the mere mention of a suspected violation already acknowledged by one's employer does not constitute a 'report' under the whistle-blower statute." *Compare Donahue v. Schwegman, Lundberg, Woessner & Kluth, P.A.*, 586 N.W.2d 811, 813–14 (Minn.Ct.App. 1998) (dealing with a situation in which the employee knew, before making the report, that the employer was aware of the violation); *with Johnson v. Indep. Sch. Dist. No. 118*, 2001 WL 605081, 2001 Minn.App. Lexis 605 (Minn. Ct.App. June 5, 2001). Even assuming that the WPA protects only initial reports, however, Currie might still prevail as he may have made the initial report to management.

his discharge, Currie's statements, if believed, could support a finding that his report regarding the dumping of paint thinner also motivated his discharge. The summary judgment must, therefore, be vacated on this issue.

## B. The Tortious Interference Claim

[¶ 30] Currie argues that Ouellette, who controlled IFPI's contract with ISI, intimidated Johnson, who controlled Currie's contract with ISI, into discharging him. Currie specifically argues that Ouellette threatened that, if Currie was not discharged, IFPI would discontinue its contract with ISI or ISL.

### 1. Elements of a Tortious Interference Claim

[¶ 31] "Tortious interference with a prospective economic advantage requires a plaintiff to prove: (1) that a valid contract or prospective economic advantage existed; (2) that the defendant interfered with that contract or advantage through fraud or intimidation; and (3) that such interference proximately caused damages." *Rutland v. Mullen,* 2002 ME 98, ¶ 13, 798 A.2d 1104, 1110. In *Pombriant v. Blue Cross/Blue Shield of Maine,* 562 A.2d 656 (Me.1989), we held that "intimidation is not restricted to 'frightening a person for coercive purposes,' " but rather exists wherever a defendant has procured a breach of contract by "making it clear" to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff. *Id.* at 659.

### 2. Analysis

[¶ 32] The statements of fact reveal that ISI and IFPI had a contract whereby ISI provided security for various IFPI facilities. Ouellette, as a regional manager for IFPI, may have had some influence over IFPI's decisions regarding the contract with ISI. Although Ouellette had the authority to recommend that Currie be discharged, Johnson, who oversaw ISI's operations and directly supervised Currie, had the authority to discharge Currie. Although Johnson resisted for several months Ouellette's urgings that Currie be discharged, he ultimately discharged Currie in July 2001. Johnson would not tell Currie why he was being discharged, indicated he was opposed to doing so, and handed Currie a letter indicating that the decision was made after conversations with Ouellette.

[¶ 33] Based on these statements, a jury could reasonably find that Ouellette intimidated Johnson. Currie alleges, essentially, that his firing was the result of a *quid pro quo:* if Johnson followed Ouellette's "recommendation" and fired Currie, Ouellette would not terminate ISL's contract with IFPI. This arrangement need not be overtly expressed to be "made clear" to Johnson. Acutely aware of the authority that Ouellette held over ISL, tacit suggestions, mere inferences, and "recommendations" may have intimidated Johnson.

[¶ 34] Based on the material facts outlined above and despite the absence of direct evidence of intimidation, a jury *could* infer that Johnson fired Currie out of fear that ISI would lose its security contract with the mill if he did not follow Ouellette's recommendation. Such an inference would be sufficient to establish intimidation on summary judgment. *Cf. Pombriant,* 562 A.2d at 659. We have recognized that summary judgment is inappropriate when the fact-finder is required to resolve a factual dispute. *See, e.g., Burdzel v. Sobus,* 2000 ME 84, ¶ 6, 750 A.2d 573, 575.

[¶ 35] A jury may decide the tortious interference claim adversely to Currie based on the lack of any direct evidence of intimidation. However, the evidence, at the very least, creates a dispute as to the circumstances surrounding Currie's discharge. A fact-finder, after hearing all the evidence, should resolve the dispute assessing all the relevant facts surrounding Currie's discharge: Currie's repeated complaints concerning Ouellette, Ouellette's subsequent promotion, and Johnson's reluctant firing of Currie at the repeated and "vocal" behest of Ouellette, who had the authority to recommend the firing of personnel from the mill manager on down.

The entry is:

The judgment is vacated and the case is remanded for further proceedings consistent with this opinion.