MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2021 ME 24
Docket:      BCD-20-164
Argued:      February 11, 2021
Decided:     April 27, 2021

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, and CONNORS, JJ.

MERIDIAN MEDICAL SYSTEMS, LLC, et al.

v.

EPIX THERAPEUTICS, INC., et al.

CONNORS, J.

[¶1]  In this business dispute asserting various tort claims, Kenneth Carr, in his capacity as assignee of claims of Meridian Medical Systems, LLC (MMS), appeals the dismissal for failure to state a claim, *see* M.R. Civ. P. 12(b)(6), of his first amended complaint (FAC) in the Business and Consumer Docket (*Murphy, J.*).  We affirm.

## I.  BACKGROUND

### A.    Standard of Review

[¶2]  We review the legal sufficiency of a complaint de novo, examining the complaint "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory."  *Nadeau v. Frydrych*,

2

2014 ME 154, ¶ 5, 108 A.3d 1254 (quotation marks omitted). The complaint "must allege facts with sufficient particularity so that, if true, they give rise to a cause of action; merely reciting the elements of a claim is not enough." *America v. Sunspray Condo. Ass'n*, 2013 ME 19, ¶ 13, 61 A.3d 1249; *see also Seacoast Hangar Condo. II Ass'n v. Martel*, 2001 ME 112, ¶ 16, 775 A.2d 1166 ("We are not bound to accept the complaint's legal conclusions." (quotation marks omitted)).

[¶3] Although this standard is forgiving, it must still "give fair notice of the cause of action by providing a short and plain statement of the claim showing that the pleader is entitled to relief." *Howe v. MMG Ins. Co.*, 2014 ME 78, ¶ 9, 95 A.3d 79 (quotation marks omitted). The complaint "must describe the essence of the claim and allege facts sufficient to demonstrate that the complaining party has been injured in a way that entitles him or her to relief." *Id.*

[¶4] The FAC, 32 pages and 126 paragraphs long, is not a "short and plain statement." M.R. Civ. P. 8(a). It includes vocabulary lacking legal significance. For example, throughout the FAC, Carr claims that the defendants "corrupted" the co-managers of MMS. While the word "corrupt" may own literary value,[1] it

---

[1] *See generally* Oscar Wilde, *The Picture of Dorian Gray* (1890).

adds no substance to a legal cause of action. Hence, like the trial court, we must parse a verbal jungle and the FAC's time- and topic-shifting recitation of facts to determine whether its allegations meet the elements of a viable claim under Maine law. Like the trial court, we conclude that they do not.

B.     The Allegations

      1.     The Parties

[¶5] The plaintiff, MMS, was a Maine LLC founded by Carr in 2001 to develop microwave technologies. Carr was MMS's chairman and CEO until he was removed from those positions in 2013 by MMS's co-managers. MMS initially filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code and eventually liquidated under Chapter 7 in 2015, with Carr purchasing certain of MMS's claims from the bankruptcy estate.

[¶6] Notably, the instant suit does *not* include any claim asserted by Carr personally, nor any claim by MMS against its co-managers.[2]

[¶7] There are three defendants: Epix Therapeutics, Inc., f/k/a Advanced Cardiac Therapeutics, Inc. (ACT); New Enterprise Associates, Inc. (NEA); and Medtronic Inc. All are Delaware corporations.

---

[2] Aside from the bankruptcy proceedings, related but separate litigation appears to include a class action in Delaware pursued by Carr against one of the defendants, *see infra* n.12, and another suit brought by Carr in Maine state court against the MMS co-managers. Both suits settled.

4

[¶8]  ACT licensed technology from MMS starting at some point in or before 2013.  NEA became a controlling shareholder in ACT in 2014.  Medtronic acquired ACT in 2019.  The only relationship any defendant had with MMS was the licensing agreement between MMS and ACT.  Neither the content nor the duration of that agreement is set forth in the FAC.

2.    The Claims

[¶9]  The gist of the FAC is that the value of MMS-owned technology was not maximized due to its co-managers' conduct, which ACT and NEA encouraged.  The FAC contains three counts: (1) aiding and abetting breaches of fiduciary duty, (2) "tortious interference," and (3) "conspiracy."  The factual allegations supporting these claims are discussed in more detail below.

II.  DISCUSSION

A.    Conspiracy and Successor Liability

[¶10]  Two components of the FAC may be disposed of succinctly.  First, under Maine law, there is no tort for "conspiracy."  *See Cohen v. Bowdoin*, 288 A.2d 106, 109-10 (Me. 1972); *see also Siegemund v. Shapland*, 324 F. Supp. 2d 176, 192 (D. Me. 2004) ("Conspiracy itself is not a cause of action under Maine law.").  Second, Carr claims that Medtronic is liable only vicariously

through ACT, so for simplification purposes, we will refer to Medtronic and ACT collectively as "ACT."[3]

[¶11]   This leaves two claims based on the actions of ACT and NEA: (1) aiding and abetting breaches of fiduciary duty, and (2) "tortious interference."  We address them seriatim.

B.      Aiding and Abetting a Breach of Fiduciary Duty

1.       Elements of the Underlying Tort

[¶12]  As a threshold matter, there must be a breach of fiduciary duty by someone, here alleged to be MMS's co-managers, Jeff Carr (Ken Carr's son) and Robert Allison.  Under Maine common law, the elements of a breach of fiduciary claim are (1) a fiduciary relationship between the plaintiff and another person, (2) a breach of the other person's fiduciary duty toward the plaintiff, and (3) damages incurred by the plaintiff proximately caused by the breach.  *See Steeves v. Bernstein, Shur, Sawyer & Nelson, P.C.*, 1998 ME 210, ¶ 10 n.8,

---

[3] The FAC alleges successor liability by Medtronic for ACT's actions based on the allegation that ACT merged into Medtronic.  The relevant provisions of the agreement between ACT and Medtronic, however, submitted with the motion to dismiss, indicate that Medtronic is in fact the parent of ACT. *See Moody v. State Liquor & Lottery Comm'n*, 2004 ME 20, ¶ 11, 843 A.2d 43 (stating that "official public documents, documents that are central to the plaintiff's claim, and documents referred to in the complaint may be properly considered on a motion to dismiss without converting the motion to one for a summary judgment when the authenticity of such documents is not challenged").  The FAC includes a conclusory claim "[u]pon information and belief" that the transaction was a merger, and Carr has argued that only excerpts of the agreement with an accompanying declaration were submitted, making dismissal premature.  Because we conclude that the FAC does not state a claim based on ACT's alleged actions, we need not address this issue further.

718 A.2d 186; *Moulton v. Moulton*, 1998 ME 31, ¶ 5, 707 A.2d 74; *Leighton v. Fleet Bank of Me.*, 634 A.2d 453, 457-58 (Me. 1993); *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975).

2.    Civil Liability for Aiding and Abetting a Breach of Fiduciary Duty

[¶13]  Once a plaintiff has adequately pleaded the breach of a fiduciary duty owed to it by another, whether the plaintiff has adequately pleaded facts upon which a third party to that fiduciary relationship can be held liable for aiding and abetting the fiduciary's breach of its duty to the plaintiff is not a simple question.  We have never squarely addressed this question.

a.    Aiding and Abetting Liability for Torts in General

[¶14]  While aiding and abetting is an "ancient criminal law doctrine," the application of the doctrine "has been at best uncertain" in the civil context. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 181 (1994) (citing *FDIC v. S. Prawer & Co.*, 829 F. Supp. 453, 457 (D. Me. 1993) ("It is clear . . . that aiding and abetting liability [for certain tortious conduct] did not exist under the common law [in Maine], but was entirely a creature of statute.")).

[¶15]  In *Barnes v. McGough*, 623 A.2d 144 (Me. 1993), we rejected a Rule 12(b)(6) dismissal of various tort claims against lawyers who had assisted other defendants in a business transaction.  We stated:

> The plaintiffs seek to impose on the lawyer defendants direct liability for their own conduct and liability for substantially assisting and encouraging the tortious actions of the [other defendants].  *See* Restatement (Second) of Torts § 876 . . . . [W]e are compelled to agree with the plaintiffs that their complaint states a claim against the lawyer defendants for fraud, interference with advantageous relations, and intentional infliction of severe emotional distress.  The complaint avers every element of each of these torts.

*Id.* at 145-46.  It is unclear whether this language adopted the Restatement (Second) of Torts § 876 (Am. L. Inst. 1979), which sets forth elements of liability for "persons acting in concert," or whether the ruling was based on allegations of the defendants' own direct commission of the torts, or a mixture of both.

[¶16]  In a subsequent appeal based on a summary judgment in favor of the same defendants, we noted that we had held in the previous appeal that the plaintiffs "had stated a cause of action against the [l]awyer [d]efendants for fraud, aiding and abetting fraud, interference with advantageous relationship, aiding and abetting interference with advantageous relationship, and intentional infliction of emotional distress." *Barnes v. Zappia*, 658 A.2d 1086, 1089 (Me. 1995).  We then affirmed the summary judgment because the

8

plaintiffs had not shown a dispute of material fact indicating that the defendants had committed the underlying torts. *See id.* at 1090 (stating that in order to support a claim for intentional infliction of emotional distress, the plaintiff must establish that the defendants inflicted the distress and that the record generated no genuine issue that the defendants' conduct met that standard).

[¶17] In sum, it is not entirely clear whether we recognized an aiding and abetting theory for the torts alleged in *Barnes*, and, if we did, whether we adopted the elements for imposing aiding and abetting liability set forth in section 876 of the Second Restatement. Maine case law regarding liability for aiding and abetting the commission of other common law torts is equally sparse.[4]

[¶18] If we were to recognize civil liability for aiding and abetting tortious conduct by others, the Second Restatement requires that the aider and

---

[4] For example, with respect to conversion, *see Sea Salt, LLC v. Bellerose*, No. 2:18-cv-00413-JAW, 2020 U.S. Dist. LEXIS 200101, at *6 n.3 (D. Me. Oct. 28, 2020) (discussing *Lewiston Tr. Co. v. Deveno*, 145 Me. 224, 226, 74 A.2d 457, 459 (1950)). In *FDIC v. S. Prawer & Co.*, 829 F. Supp. 453, 457 (D. Me. 1993), the federal district court held that there was no liability under the Maine common law for aiding and abetting fraudulent transfer or concealment of property. It did not conclude that a person could not be liable for aiding and abetting as to any tort under Maine law; to the contrary, citing *Barnes v. McGough*, 623 A.2d 144 (Me. 1993), it stated that "[i]n Maine the tort of aiding and abetting a tortious action is drawn from section 876 of the Restatement of Torts." *S. Prawer & Co.*, 829 F. Supp. at 457.

abettor "know[] that the other's conduct constitutes a breach of duty and give[] substantial assistance or encouragement to the other so to conduct himself." Restatement (Second) of Torts § 876(b). This requirement has been refined by courts to mean that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

[¶19]  Thus, at a minimum, here, in order to state a claim, the FAC would need to contain factual allegations to support inferences that ACT and NEA knew that the co-managers were engaging in a breach of their fiduciary duty toward MMS and that ACT and NEA engaged in conduct amounting to substantial assistance in the commission of the breach.

[¶20]  In rejecting civil liability for conspiracy, we have emphasized the immateriality of whether a defendant was acting in concert with another person and focused instead on the need to prove that the defendant engaged in the underlying tortious activity. *See Cohen,* 288 A.2d at 110 ("[T]his Court has explicitly decided as general law that 'conspiracy' fails as the basis for the

imposition of civil liability absent the *actual commission* of some *independently recognized tort*; and when such separate tort has been committed, it is *that tort*, and not the fact of combination, which is the foundation of the civil liability."); *see also Garing v. Fraser*, 76 Me. 37, 41 (1884) ("The gist of the action is not the conspiracy alleged, but the tort committed by the defendants and the damage resulting therefrom."). Because we do not recognize accomplice liability for civil conspiracy, it is logical to ask whether we also reject liability for aiding and abetting.

[¶21] Although the doctrines of conspiracy and aiding and abetting both involve liability for acting in concert with a principal tortfeasor, these doctrines are not so similar that the rejection of liability for conspiracy means ipso facto that we will reject liability for aiding and abetting. The two doctrines are conceptually distinct, with the former involving an agreement and the latter focusing on assistance in committing the underlying tort. *See Halberstam*, 705 F.2d at 478; Nathan Isaac Combs, Note, *Civil Aiding and Abetting Liability*, 58 Vand. L. Rev. 241, 256-59 (2005).

[¶22] We conclude, consistent with *Barnes* and without running afoul of the reasoning in *Cohen*, that civil liability can attach for aiding and abetting another's tortious conduct—with two important caveats.

[¶23] First, the aider and abettor must have actual—and not merely constructive—knowledge that the principal tortfeasor is engaged in tortious conduct. This scienter requirement is necessary to avoid "cast[ing] too wide a net, bringing under it parties involved in nothing more than routine business transactions." *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991); *see Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95 (5th Cir. 1975). As one court stated:

> The nature of wrongdoing alleged in this case also supports a requirement that a party actually know that a breach of fiduciary duty is intended and consummated. Transactions which may appear reasonable at the time they are entered into may, upon more considered and deliberate reflection, prove to be objectively unreasonable. However, to impose affirmative liability on a purchaser in a commercial transaction without concrete evidence of both its knowledge of the self-interest or bad faith of the seller and its unavoidable awareness of the transaction's substantive unfairness or lack of business purpose would disrupt commercial activity in a manner wholly inconsistent with the purposes of aider and abettor liability.

*Terrydale Liquidating Tr. v. Barness*, 611 F. Supp. 1006, 1030 (S.D.N.Y. 1984).

[¶24] Second, the defendant must commit acts constituting *substantial* assistance in the commission of the underlying tort. The factors listed in section 876 relevant to determining whether this substantial assistance element has been met, which we adopt for purposes of this discussion, include the nature of the act encouraged, the amount of assistance given, the defendant's absence or presence at the time of the tort, the defendant's relation

12

to the tortious actor, and the defendant's state of mind. *See* Restatement (Second) of Torts § 876 cmt. d. Because our focus in Maine remains on the underlying tort, the substantiality of the aider and abettor's assistance must be able to be reasonably inferred from the aider and abettor's alleged concrete actions.

b.      Aiding and Abetting a Breach of Fiduciary Duty

[¶25]  The next questions are whether there is anything distinct about the tort of a breach of fiduciary duty to reject imposing an aiding and abetting theory of liability as to that particular tort, and, if not, what level of specificity in the allegations is needed to survive a Rule 12(b)(6) motion to dismiss.

[¶26]  Generally speaking, recognition of an aiding and abetting basis for liability for a breach of fiduciary duty has gained traction in other jurisdictions. *See* Alison Gurr, *Three's a Crowd or a Charm?  Third Party Liability for Participating in Breaches of Fiduciary Duty*, 53 San Diego L. Rev. 609, 611-12, 612 n. 7 (2016) (stating that, as of January 2015, approximately twenty-eight states appeared to have adopted this cause of action, two states had expressly refused to adopt it, and the remainder had left the issue open or had not yet addressed the issue).[5]  We see no reason why breach of fiduciary duty should

---

[5] Since then, the following states appear to have authorized this cause of action: Hawaii, *Molokai Servs. v. Hodgins*, No. CAAP-15-0000464, 2018 Haw. App. LEXIS 92, at *26-27 (Haw. Ct. App.

be excluded from those torts for which liability might be imposed for aiding and abetting another's tortious conduct.

[¶27]   That said, we have also ruled that "because the law does not generally require individuals to act for the benefit of others, the factual foundations of an alleged fiduciary relationship must be pled with specificity." *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 21, 738 A.2d 839.  The same logic extends to allegations of aiding and abetting a breach of those duties.  Because the law does not generally require someone to act on someone else's behalf, as opposed to that person's own, a complaint must contain factual allegations with sufficient specificity to show why a defendant with no fiduciary duty toward a plaintiff should be held to such a duty through an aiding and abetting theory.  The same concerns of litigation abuse and capturing ordinary corporate acts that trigger the need for an actual knowledge scienter requirement also support requiring specificity in the allegations upon which liability is being sought against the purported aider and abettor.  *See Bean v. Cummings*, 2008 ME 18, ¶¶ 8, 13, 939 A.2d 676 (requiring civil perjury

---

Feb. 28, 2018); Idaho, *Miesen v. Henderson*, No. 1:10-cv-00404-CWD, 2017 U.S. Dist. LEXIS 159838, at *14-19 (D. Idaho Sept. 26, 2017); and South Carolina, *Bennett v. Carter*, 807 S.E.2d 197, 200 (S.C. 2017).

14

claims to be pleaded with particularity because of the potential for abuse of such claims).[6]

[¶28]   To summarize, to the extent that we recognize civil liability for aiding and abetting a breach of fiduciary duty, aside from the general need in notice pleading to include factual allegations meeting each element of a claim, a plaintiff must allege with specificity that the defendant had actual knowledge that the principal tortfeasor was committing a breach of fiduciary duty and that the defendant performed substantial acts in order to assist in the commission of that tort.

[¶29]  Applying this law, Carr's fiduciary claim against ACT and NEA fails.

3.     Application of the Law to the Facts as Alleged

[¶30]   The FAC sets forth allegations meeting the first element of the underlying tort—the co-managers of MMS held a fiduciary relationship with the LLC.  *See* 31 M.R.S. § 1559 (2021); *Cianchette v. Cianchette*, 2019 ME 87, ¶¶ 33-35, 209 A.3d 745.[7]

---

[6]  The U.S. Supreme Court cited a similar potential for litigation abuse when it suggested that Congress likely did not intend to include liability for aiding and abetting in the context of a securities law statute. *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 189-90 (1994).

[7]  As discussed in *Cianchette v. Cianchette*, 2019 ME 87, ¶ 35, 209 A.3d 745, under the Maine Limited Liability Company Act, 31 M.R.S. §§ 1501-1693 (2021), a fiduciary relationship exists between the manager of an LLC and the LLC.  ACT argues that Carr did not cite the Act in his complaint and that an LLC may expand or contract the scope of fiduciary duties owed to an LLC and its members

[¶31]  We must therefore determine whether the complaint alleges, with the required specificity, that the co-managers breached their fiduciary duties to MMS and that ACT and NEA aided and abetted those breaches.  The FAC alleges that the co-managers breached their fiduciary duties by "aligning" with ACT and NEA and that ACT and NEA aided and abetted this breach by "corrupting" the co-managers in order to "exploit" MMS's technology.  None of these quoted words provide substance.  Focusing on the allegations identifying the defendants' actual conduct, the FAC alleges the following activities.

        a.      Entry into the Licensing Agreement

[¶32]  By 2013, ACT had entered into a licensing agreement with MMS. This action taken between MMS and ACT cannot sustain MMS's claim of a breach of fiduciary duty because the activity is innocent in itself—indeed, it undermines any claim that ACT was attempting to steal MMS's technology.  The

---

pursuant to provisions in the LLC agreement. *See* 31 M.R.S. § 1521(3).  We normally do not require citation of the legal theory to adequately plead a cause of action; it is enough that Carr identified his son and Allison as co-managers of the LLC.  *See Anderson v. Kennebec River Pulp & Paper Co.*, 433 A.2d 752, 756 n.5 (Me. 1981); 1 Field, McKusick & Wroth, *Maine Civil Practice* § 8.2 at 196 (2d ed. 1970) (providing that "the pleader in stating his claim is not required to plead his legal theory in any particular form").  Carr also did not have to plead a negative, i.e., that MMS's LLC agreement did not narrow the duties otherwise owed by co-managers.  Neither ACT nor NEA provided a copy of MMS's agreement; nor did either cite to any provisions in the agreement narrowing the co-managers' fiduciary duties.  Section 1507(2) provides that, unless displaced by particular provisions of the Act, principles of law and equity supplement the Act.  Although the Act establishes that a fiduciary relationship existed between the co-managers and MMS, in the absence of argument otherwise, we assume that the nature of the LLC co-managers' fiduciary duties required by Maine law are those imposed under the common law.

16

FAC does not allege that there was anything untoward in this transaction, and it appears to have occurred when Carr, not the co-managers, controlled MMS. Nor does the FAC allege any specific acts by NEA to participate in the negotiation or execution of this agreement, which occurred before NEA invested in ACT.

b.    Carr's Ouster as Manager of MMS

[¶33]   The FAC alleges that Carr gifted equity in MMS to his son and Allison in 2010-2011 such that they could gain control of MMS and that they used that control to remove Carr as chairman and CEO of MMS in June 2013.

[¶34] Such removal by majority owners constitutes ordinary governance of an LLC and seems to have resulted in a personal grievance held by Carr against his son and Allison. *See* Appellant's Br. at 2 ("In or about 2013, Jeff Carr and Allison began discussing ways to force Ken Carr out of MMS in order to build direct relationships with ACT and improperly to exclude other minority-equity holders as much as possible from receiving any of the rewards of MMS ownership."  (citing FAC, ¶¶ 3, 38)).   A plot by majority owners or co-managers to exclude nonmanaging minority members from the rewards of LLC ownership might form the basis of a personal claim by the minority members, but it does not support a claim on behalf of the LLC itself.

c. Differing Business Philosophies

[¶35] The FAC alleges that while Carr was in control of MMS, he had focused on maximizing its long-term value by improving its technology and launching products using that technology. In contrast, the co-managers, "together" with ACT and NEA, sought an "early exit strategy."

[¶36] These allegations suggest a disagreement in business strategy between a more risk-averse nonmanaging member of an LLC and its managing members. *See* FAC, ¶ 40 (alleging that the co-managers "expressed their view that Ken Carr was merely acting like a 'boy scout,' was being 'too conservative,' and was 'holding MMS back'"). Carr believes that instead of "aligning" with ACT and NEA through, e.g., exploring a potential acquisition by ACT of MMS, MMS should have taken a different strategy (although the FAC does not identify the alternatives available to MMS).

[¶37] A differing business philosophy among LLC members is not a breach of fiduciary duty by co-managers against the LLC, even if it turns out that the co-managers' choice was not the optimal one. *See Rosenthal v. Rosenthal*, 543 A.2d 348, 353-54 (Me. 1988) (stating that business decisions made by corporate directors are not subject to judicial review unless they are the result of "bad faith or fraud"). While a breach of fiduciary duty could

constitute bad faith sufficient to strip a manager's decision-making of the benefit of the business judgment rule, the FAC is devoid of factual allegations indicating why the pursuit of the "alignment" strategy chosen by the co-managers here was even negligent, and more than conclusory allegations are required. *See Sunspray Condo. Ass'n*, 2013 ME 19, ¶¶ 15-16, 61 A.3d 1249 (affirming dismissal pursuant to Rule 12(b)(6) because more than conclusory assertions of bad faith were required to make the business judgment rule inapplicable, and the actions recited in the complaint did not reflect such bad faith). As the licensor of MMS's technology, ACT would seem a logical choice for MMS to seek opportunities to expand their relationship. And ACT and NEA, neither of which owed fiduciary duties toward MMS, were free to act in their own best interests and encourage MMS to "align" with them, whether that alignment turned out to be in MMS's best interest or not.

d. Attempted Theft of Carr's Patents

[¶38] The FAC includes allegations that the co-managers tried to "steal" patents owned by Carr personally. These allegations again might set forth a claim by Carr individually against the co-managers, but they do not allege a breach by the co-managers of a duty owed to MMS. *See, e.g.*, FAC, ¶ 71 ("Through these actions, [the co-managers] worked with each other and others

to develop a materially false record that excluded Ken Carr from valuable technology. . . .").

[¶39]   The FAC also does not allege that this attempted theft was successful, nor how it proximately caused damage to MMS.[8]   Nor does the FAC include specific factual allegations of active participation by ACT or NEA in the attempted theft.

e.      Consulting Agreements

[¶40]   Carr argues that the FAC sets forth sufficient allegations of wrongful conduct because it posits a "quid pro quo"—the co-managers were enticed to adopt their strategy of alignment with ACT and NEA by "disproportionate" personal consulting agreements "negotiated" with ACT. These allegations do not sufficiently allege a claim that the co-managers breached their fiduciary duties to MMS, for several reasons.

[¶41]   First, given that there is nothing nefarious about a business strategy of aligning with the corporation to which an LLC licenses its technology, the co-managers' pursuing such agreements, without more, does

---

[8] After reciting actions taken by the co-managers in 2012-2013 in an alleged attempt to take away or claim a share in Carr's patents, the FAC alleges: "Eventually, [the co-managers'] disloyalty to MMS bankrupted MMS, in or about the fall of 2015."   Nowhere are the dots connected as to how the co-managers' attempt to assert a share of ownership in patents Carr alleges belong to him personally resulted in MMS's bankruptcy two years later.

not constitute a conflict of interest precluding such agreements, particularly when the FAC is devoid of any description of the content of these agreements.

[¶42]   Second, again, ACT and NEA owed no fiduciary duties to MMS. There is a logic in wanting to hire experts familiar with technology that a corporation is licensing.   Even if entering the consulting agreements would constitute a breach of the co-managers' fiduciary duty to MMS, the allegation that ACT and NEA entered into consulting agreements with the co-managers is not in itself sufficient to support a claim for aiding and abetting the fiduciary's tort.  *See Arcidi v. Nat'l Ass'n of Gov't Emps., Inc.*, 856 N.E.2d 167, 174 (Mass. 2006) ("NAGE's only evidence of Arcidi's participation is the fact that he entered into the consulting agreement.   Even assuming that Lyons was not authorized to make the illegal agreement and that he thus breached his fiduciary duties to NAGE, the parties have directed us to no case holding a third party liable to a principal merely for entering into an arm's-length transaction that happens to exceed an agent's authority.").

[¶43]   Finally, while the consulting agreements were "negotiated," they were never consummated, escalating the insufficiency of the allegations that MMS was somehow injured by these negotiations.

f.    The Remaining Proprietary Information Allegation

[¶44]  This leaves two sentences in one paragraph of the FAC: "During [late 2013 and throughout 2014], NEA provided value to Allison to corrupt him and cause him to breach his fiduciary duties to MMS.  In return, Allison provided to ACT confidential information, trade secrets and services belonging to MMS in violation of his fiduciary duties owed to MMS."

[¶45]  In theory, such a deal could support a cause of action for aiding and abetting a breach of fiduciary duty.  If, for example, this paragraph alleged that ACT and NEA stole substantial technology owned by MMS through bribes to the co-managers and specified how NEA or ACT paid the co-managers a certain amount for their own personal profit to hand over that technology, and if ACT and NEA knew that ACT was not entitled to the technology under its licensing agreement, such allegations might suffice to withstand a motion to dismiss, pursuant to Rule 12(b)(6).

[¶46]  But that is not what these sentences say.  First, they do not identify facts indicating ACT did anything wrong.  Second, they do not—nor does any other language in the FAC—identify what "value" was transferred to Allison, by whom, or for what; the worth of the unidentified item of value; whether the "value" transferred was given to Allison for his personal profit; or whether or

how whatever was transferred by the co-managers to ACT was beyond the scope of ACT's existing licensing agreement with MMS. Although viewed in isolation these two sentences might form the kernel of an allegation of an illicit bribery scheme, in the context of the FAC's other allegations, involving a corporation with an existing licensing agreement with an LLC and owing no fiduciary duty towards that LLC, the many innocent explanations for "value" bestowed upon a co-manager of the LLC demand more specificity in order to state a claim for knowingly aiding and abetting a breach of fiduciary duty. Absent allegations that the transfer of "value" was for technology not authorized by the existing licensing agreement, these sentences fail to demonstrate anything improper.

[¶47] For example, paragraph 92 of the FAC states that NEA's goal was "to corrupt [the co-managers] so that they would effectively surrender MMS's technology on the cheap." There is nothing wrong with a controlling shareholder of a corporation that has a licensing agreement with an LLC taking a manager of the LLC out to lunch in a quest to encourage a licensing agreement with favorable terms to the corporation. Yet those facts would meet the factual allegations contained in these two sentences. Even ordinary notice pleading requires sufficient specificity to show why conduct is actionable. *See Carey v.*

*Bd. of Overseers of the Bar*, 2018 ME 119, ¶ 23, 192 A.3d 589 (concluding that an allegation that governmental employees "'engaged in repeated malfeasance and prolonged efforts to wrongfully destroy [the plaintiff's] professional career and reputation through false and embellished swearing, testimony and accusations'" was legally deficient to state a claim pursuant to the Maine Tort Claims Act because "[the plaintiff] never specifically assert[ed] what these efforts were").

[¶48]   As noted, *supra* ¶ 24, the aider and abettor must provide *substantial* assistance in the commission of the breach.  The FAC is devoid of specific factual allegations regarding most of the factors listed in the Restatement (Second) of Torts § 876 cmt. d as relevant to determining whether this substantial assistance element has been met, including the nature of the act encouraged, the amount of assistance given, and the defendant's absence or presence at the time of the tort.  And although the FAC is replete with allusions to ACT and NEA's "knowing" activities, there is no allegation asserting this knowledge was actual, versus constructive, nor facts from which such actual knowledge can be inferred.  Although specific facts regarding a bribe to steal MMS property might be sufficient to ground such an inference, buying someone lunch is not.

[¶49] Because the actual conduct by ACT and NEA as alleged does not constitute knowing, substantial assistance in any breach of fiduciary duty by the co-managers proximately causing harm to MMS, the FAC fails to state a claim.

C.      Tortious Interference

[¶50] We next turn to "tortious interference." The FAC does not assert that ACT and NEA are liable for this tort as accomplices, but rather claims that ACT and NEA are directly liable for their own breaches of duties they owed to MMS.

[¶51] A viable claim for tortious interference with either an existing contractual relation or a prospective economic advantage requires (1) the existence of a valid contract or prospective economic advantage, (2) interference with that contract or advantage though fraud or intimidation, and (3) damages proximately caused by the interference. *Zappia*, 658 A.2d at 1090; *Harlor v. Amica Mut. Ins. Co.*, 2016 ME 161, ¶ 12, 150 A.3d 793; *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 31, 915 A.2d 400.

[¶52] The factual predicate set forth by Carr for this claim is, consistent with the remainder of the FAC, convoluted and vague.

[¶53] Starting with the necessary element of a contract or prospective economic advantage, paragraph 119 alleges that "at various points in 2014, MMS enjoyed a reasonable expectation of economic advantage and contract-based expectations under the warrant purchased by Abbott to enjoy at least $3 million and up to $5 million in the proceeds from a sale of ACT." While this language could reference a claim based either on an existing contract or a prospective economic advantage, Carr has clarified that he is advancing a claim for interference with a prospective economic advantage.

[¶54] "Abbott" refers to nonparty Abbott Laboratories. A warrant is basically a type of option. *See* 17 C.F.R. § 240.12a-4(a)(1) (2021); *In re Daig Corp.*, 799 F.2d 1251, 1253 (8th Cir. 1986). While the terms of the referenced warrant are not set forth with any coherence in the FAC, the gist appears to be that there was a proposed transaction between Abbott and ACT in which Abbott would acquire ACT, and, as a part of this acquisition by Abbott of ACT, ACT would purchase MMS for between $3 million and $5 million.[9]

---

[9] *See* FAC, ¶ 119 ("MMS enjoyed a reasonable expectation of economic advantage and contract-based expectations under the warrant purchased by Abbott to enjoy at least $3 million and up to $5 million in the proceeds from a sale of ACT."); FAC, ¶ 81 ("The proposal from Abbott contemplated a $5 million payment for MMS."). The defendants submitted a copy of this warrant. *See Moody,* 2004 ME 20, ¶ 11, 843 A.2d 43. It indicates that ACT might acquire control of MMS or might convert its existing royalty-bearing license with MMS to a fully paid-up license, and if that occurred and the warrant were exercised, ACT would be entitled to additional payment.

26

[¶55] If one assumes that the complaint's reference to the warrant sufficiently identifies a nonspeculative prospective advantage,[10] ACT is not a viable defendant because it cannot interfere with its own contract, i.e., the alleged sale agreement between MMS and ACT. *See* Restatement (Second) of Torts § 766A (Am. L. Inst. 1979) (imposing liability for one who intentionally and improperly interferes with the performance of a contract between "another and a third person"); Restatement (Third) of Torts: Liability for Economic Harm § 17(1)(a) (Am. L. Inst. 2020) (providing that a defendant is subject to liability if "a valid contract existed between the plaintiff and a third party"); Restatement (Third) of Torts: Liability for Economic Harm § 17 cmt. o (Am. L. Inst. 2020) ("Liability does not arise when the contractual relationship at issue is between the plaintiff and the defendant. Put differently, a defendant cannot be sued under this Section for interfering with its own contract, whether alone or in a conspiracy with others.").

---

[10] The prospective advantage must be reasonably probable. *See, e.g.*, *Tensor Law P.C. v. Rubin*, No. 2:18-cv-01490-SVW-SK, 2019 U.S. Dist. LEXIS 131942, at *36 (C.D. Cal. Apr. 10, 2019) ("A plaintiff asserting a claim of tortious interference with prospective economic advantage must establish that it is reasonably probable that the prospective economic advantage would have been realized but for defendant's interference." (quotation marks omitted)); *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1033 (N.D. Cal. 2018) ("To show an economic relationship, the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference." (quotation marks omitted)); *Hayes v. N. Hills Gen. Hosp.*, 590 N.W.2d 243, 250 (S.D. 1999) (stating that it must be "reasonably probable that [the] prospective economic advantage would have been realized but for the defendants' conduct" (alterations omitted) (quotation marks omitted)).

[¶56]  We need not answer the question whether NEA, as the controlling shareholder in ACT, shares a unity of interest with ACT preventing it also from being a viable defendant, *see, e.g.*, *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*, 475 F.3d 783, 801 (6th Cir. 2007) (concluding under Michigan law that the interests of a controlling shareholder are too unified with the interests of the controlled corporation to ground a tortious interference claim), because even if the answer were no, the complaint is devoid of factual allegations sufficient to assert the second element of the tort—fraud or intimidation.

[¶57]  Carr argues that his claim of a quid pro quo—the alleged enticements to the co-managers by ACT or NEA to align with them instead of more favorable unidentified options in the market for MMS—is sufficient to plead coercion amounting to intimidation, citing *Currie*, 2007 ME 12, ¶ 33, 915 A.2d 400, and *Pombriant v. Blue Cross/Blue Shield of Me.*, 562 A.2d 656, 659 (Me. 1989).  These decisions do not support his argument.

[¶58]  In *Currie*, the plaintiff was a security guard employee for a company that contracted to provide services at another company's facilities. 2007 ME 12, ¶ 2, 915 A.2d 400.  A regional manager with authority over whether the security contract would continue pressured the plaintiff's

employer to fire the plaintiff. *Id.* ¶ 32. The employer resisted, then capitulated "out of fear" that the regional manager would cause the employer's contract to be terminated. *Id.* ¶¶ 32-34. We held that a reasonable jury could conclude that this understood potential retribution of contract termination could constitute intimidation. *Id.* ¶ 33. Similarly, in *Pombriant*, the defendant made it clear that the "only manner" in which the plaintiff could avail itself of lower rates would be by changing to the defendant's preferred brokerage. 562 A.2d at 659. These decisions stand for the proposition that "wherever a defendant has procured a breach of contract by 'making it clear' to the party with which the plaintiff had contracted that the only manner in which that party could avail itself of a particular benefit of working with defendant would be to breach its contract with plaintiff," the intimidation element of a claim for tortious interference with a contract exists. *Currie*, 2007 ME 12, ¶ 31, 915 A.2d 400 (quoting *Pombriant*, 562 A.2d at 659).

[¶59] The FAC alleges no such intimidation. It does not allege either an existing contract between MMS and a third party, or a threat by NEA not to contract with a third party unless the third party terminated a contract with MMS.[11] Ultimately, Abbott's warrant did not lead to a deal in which ACT was

---

[11] Notably, unlike the Restatement (Second) of Torts § 766A (Am. L. Inst. 1979), when addressing prospective advantage claims (called "interference with economic expectation"), the Restatement

bought by Abbott and MMS was in turn bought by ACT; in the end, years after the events complained of in the FAC, ACT was bought by Medtronic. But there are no allegations that NEA coerced Abbott or anyone not to do business with MMS.

[¶60] There are allusions in the FAC to the warrant "locking up" ACT and the MMS technology for three years, which could generously be read to suggest that while the warrant was in place, ACT's licensing agreement with MMS prevented MMS from shopping around for a better deal to sell or license its technology. But first, that interpretation seems inconsistent with paragraph 119 of the FAC, which alleges that the injury to MMS was the lack of a sale to ACT. Nor are there any other allegations explaining why MMS could not choose to end its licensing agreement with ACT or explore other opportunities. While the FAC alleges that the co-managers were "corrupted" to "align" with ACT by NEA's negotiation of consulting agreements between ACT and the co-managers or for other "value," such enticements do not constitute unlawful pressure on a third party not to do business with MMS. Any better deal not anticipated in the warrant, moreover, would be sheer speculation

---

(Third) of Torts: Liability for Economic Harm § 18(b) & cmt. b (Am. L. Inst. 2020) requires wrongful conduct amounting to "an independent and intentional legal wrong," such as fraud or defamation; "sharp practice" or unethical behavior is insufficient.

insufficient to support a claim of prospective advantage claim. *See supra* n.10. And, in the end, NEA was simply the controlling shareholder in ACT.

[¶61] Adding further confusion, the FAC appears to be alleging that when, contemporaneous with the warrant, Medtronic made an offer better than a deal by which MMS would profit by being sold or having its technology sold to ACT and ACT sold to Abbott, NEA thwarted the better Medtronic deal in favor of a deal with Abbott because NEA wanted to sell another entity in which it held an interest to Abbott. The FAC asserts that these actions by NEA breached a duty that NEA owed to ACT.[12] There is no allegation that MMS would have profited in the better Medtronic deal—which is not alleged to be the prospective economic advantage interfered with in any event—or that NEA took any action to persuade Medtronic not to deal with MMS.

[¶62] In the end, the FAC reflects Carr's opinion that the co-managers should not have pursued a business strategy of alignment with ACT and that

---

[12] The FAC alleges that the NEA deal to sell the other company to Abbott was consummated at great profit to NEA and to the detriment of ACT. It further alleges that Carr was a minority shareholder in ACT and pursued a class action in 2017 in Delaware on behalf of certain minority ACT shareholders, resulting in a settlement to compensate these shareholders for what they would have received had ACT been sold to Abbott. The FAC alleges that this scheme of NEA's "devalued ACT" which in turn "devalued MMS and its technology." But there is no explanation of how NEA's conduct devalued MMS, or why a maneuver by NEA to favor one corporation in which it held an interest over another, ACT, would sustain a claim of interfering with a contractual relationship or prospective economic advantage between MMS and a third party.

the co-managers were encouraged to do so by ACT and NEA. But without specific factual allegations showing how the elements of the causes of action asserted in the FAC were met—how ACT and NEA knowingly participated in and substantially assisted with a breach of the co-managers' fiduciary duties or how they coerced third parties not to do business with MMS—the FAC fails to state claims upon which relief could be granted.

The entry is:

Judgment affirmed.

---

Randy J. Creswell, Esq., CreswellLaw, Portland, and Barry S. Pollack, Esq. (orally), and Ashly Scheufele, Esq., Pollack Soloman Duffy LLP, Boston, Massachusetts, for appellants Meridian Medical Systems, LLC, and Kenneth L. Carr

Courtney Worcester, Esq. (orally), and Roger A. Lane, Esq., Holland & Knight LLP, Boston, Massachusetts, for appellee New Enterprise Associates, Inc.

Clifford H. Ruprecht, Esq., Roach Ruprecht Sanchez & Biscoff, P.C., Portland, and Joseph T. Dixon, Esq. (orally), and Anupama D. Sreekanth, Esq., Fredrikson & Byron, P.A., Minneapolis, Minnesota, for appellees Epix Therapeutics, Inc., and Medtronic, Inc.

Business and Consumer Docket docket number CV-2019-54
FOR CLERK REFERENCE ONLY